IVEY'S PLUMBING & ELECTRIC
COMPANY INC., Plaintiff,

v.

PETROCHEM MAINTENANCE, INC.
and Gardner-Denver Company,
Defendants.

No. EC 78–57–K.

United States District Court,
N. D. Mississippi, E. D.

Dec. 19, 1978.

David W. Mockbee, Jackson, Miss., for plaintiff.

Fred Krutz, III, Jackson, Miss., for Petrochem.

Henderson S. Hall, Jr., Jackson, Miss., for Gardner-Denver.

## MEMORANDUM OF DECISION

KEADY, Chief Judge.

In this diversity action removed from the Chancery Court of Attala County, Mississippi, Ivey's Plumbing & Electric Company, Inc. (Ivey's), a Mississippi corporation engaged in the contracting business with its offices located at Kosciusko, seeks damages in the sum of $31,926.38 plus interest and attorney fees from two defendants, Gardner-Denver Company (G–D), a Delaware corporation engaged in the manufacture of equipment, and Petrochem Maintenance, Inc. (Petrochem), a Louisiana corporation engaged as a supplier of contractor's equipment.

The court has before it the motion of defendant G–D for summary judgment on the claims against it asserted by plaintiff Ivey's as well as the co-defendant Petrochem. Similarly, Petrochem has a motion for summary judgment against Ivey's, as well as the cross-claim interposed against it by G–D. Certain material facts, clearly established by the record, enable us to dispose of several aspects of these motions. It is, of course, elemental that if there is a dispute of material fact or inferences have to be weighed in order to determine the facts, or unless it clearly appears as a matter of law that the movant for summary judgment is entitled to prevail, it would be inappropriate to grant any portion of the motions of G–D and Petrochem for summary judgment. We therefore restrict our consideration only to undisputed facts upon the basis of the evidentiary material presented to the court at this juncture.

Sometime prior to September 13, 1977, Ivey's became interested in submitting a bid as subcontractor for the mechanical portion of a construction project designated as the Maintenance and Repair Facility, Naval Construction Battalion Facility, at Gulfport, Mississippi. In order to submit a bid it was necessary for Ivey's to receive quotations on five air compressors called for by the project specifications. Petrochem supplied a quotation orally on September 13; its quotation for $89,073.62 being the lowest for these components, Ivey's used it in making its bid, which was that day accepted by the prime contractor. The day before, Petrochem had obtained an oral quotation from G–D's agent, Robert Theriot, who gave Petrochem an estimate sheet listing two of the air compressors with accessory equipment, orally indicating they could supply three more compressors at the same unit price. This document, entitled "Estimate Sheet" was dated September 12 and signed by Theriot.

Shortly after Ivey's made its successful bid as mechanical contractor, Lonnie Wright, Petrochem's branch manager, learned that other suppliers such as Ingersoll-Rand and Sandair Corporations were quoting five compressors of like character with equipment for a reported $144,000, or approximately $64,000 more than Petrochem's quotation to Ivey's and so advised G–D. G–D's agents, Theriot and Don Geers, visited Petrochem's office to review the project's plans and specifications which were in Petrochem's possession. On September 26, G–D issued a revised quotation for the compressors and equipment called for by the plans and specifications for approximately $113,000. Petrochem, ignoring this revised quotation, issued a purchase order on October 24 to G–D for the lump sum price of $80,366.24, which was the amount of the original oral quotation by G–D. On November 4, Wright forwarded a letter to G–D advising that Petrochem had not received notice of G–D's intention to fulfill the purchase order of October 24 and stated that "should we fail to receive notice by November 7 we shall be compelled to assume that you do not intend to fulfill the contract." By letter dated November 7, G–D advised that it did not intend to furnish equipment as per their original quota-

tion but only in accordance with their revised quotation of September 26.

Meanwhile, Ivey's had become apprised of the quotation problems connected with Petrochem's supplying the air compressors and equipment at the originally quoted price. On October 6, Lonnie Wright and Jonathan Beeson, representing Petrochem, met at Ivey's office at Kosciusko with Don Hayes, Ivey's vice-president and senior project manager. At this meeting, Hayes delivered a purchase order to Wright for the compressor equipment in the amount of $89,073.62. Immediately prior to the issuance of the purchase order, certain discussions took place regarding problems associated with the quotation on the air compressors. Although the depositions of Lonnie Wright and Don Geers were taken, they did not undertake to give their version of what occurred. Only Don Hayes in his discovery deposition was asked about what took place before the purchase order was handed to Wright. The relevant portion of that testimony is as follows:

Q . . . what was the substance of the conversation that took place at that meeting . . . ?

A [Petrochem] told me that Gardner-Denver was not going to honor their quotation, and I handed them a purchase order. . . . The gist of it was that I was going to look to them to furnish the air compressors at the quoted price. It was that simple. We might have elaborated for an hour and a half, or however long they were there, and I probably told them that they needed to protect themselves, because we were looking for five air compressors for $89,000. . . (Hayes' dep., p. 85)

Q Is it true though, Mr. Hayes, that you submitted this . . . purchase order to Mr. Beeson subsequent to the time he told you that he would not be able to supply the air compressors for $89,073?

A If subsequent you mean immediately after he told me that I handed it to him, yes, I would say it was—it wasn't no five or six days later. It might have been one minute, two minutes.

Q But the first act was him telling you he couldn't supply them; the second act being you handed him the purchase order.

A Right.

Q Okay. When you gave him the purchase order, it is also a fact, is it not, that he, John Beeson, expressly stated he was not accepting that as a purchase order and he wouldn't be able to produce unless Gardner-Denver produced?

A I couldn't say exactly what he said. He may have said that. The gist— the feeling was that Petrochem was in the middle. They quoted Gardner-Denver. Petrochem quoted us. All right, even though they say that they couldn't supply them, we have a quotation that we relied upon to get the bid. I'm positive that that quotation was out to some of my competitors . . . and I'm sure my competitors used it. I used it to get the bid; whether it was that specific thing that got it or I left labor low or what. Whatever, we got the job. All right, I used it to get the job. Subsequently, I issued them a purchase order. Whether he said he couldn't supply it or not is beside the point, as far as I was concerned.

Q Um-hum, well,—

A And did he say that specifically, I doubt if he said it just like that because Jon Beeson and Lonnie's attitude was that they were there to help. They took that attitude and have had that attitude all along. In fact, all through this thing both of them have been very open and above board and treated us the way we would like to be treated. It is just that they got caught and couldn't furnish what—and that was the attitude that prevailed in that meeting. (Id. pp. 86–87).

*      *      *      *      *      *

Q . . . That's not quite correct, though, is it Mr. Hayes, because as you have testified to, isn't it a fact that they refused to supply the air compressors before they received the purchase order?

A Not necessarily. If you will recall, I made the statement that Lonnie Wright sent Gardner-Denver a telegram. This was after the 6th October meeting.

Q But—

A And they were asking Gardner-Denver to furnish the air compressors. If you will look over my correspondence, all of the correspondence was generated after this meeting. So, they had not refused to supply the air compressors at this time.

Q Well, this is not a not-necessarily-answer question here.

A Okay.

Q This is a yes-or-no answer question: Did—on October 6 isn't it a fact that Jon Beeson told you that he could not supply the air compressors before you issued him the purchase order?

A I can't answer that a yes or no. From the attitude of the meeting, I would have to say that he did not say that in those terms. He may have said Gardner-Denver probably isn't, but there was no—I'll say this, there was no definitive, no specific—by either Lonnie or Jon—that they were not going to do this.

Q Okay, let me ask it this way:—

A This is apparent by the correspondence after this fact.

Q Well,—

A And they had a very congenial attitude, and they were totally on my side at that point where they left.

Q Well, let me ask it this way, then: Isn't it a fact that Jon Beeson told you on October 6th before you handed him the purchase order that he could not supply the air compressors at $89,073 unless Gardner-Denver supplied it to him for Gardner-Denver's quote to him?

A I don't know if he said it; it is a fair statement. (Id. pp. 89–90)

On November 1, Ivey's wrote Petrochem advising that it had received notice of the latter's attempt to fulfill the October 6 purchase order, and stating that unless Petrochem notified Ivey's by November 4 the subcontractor would have no alternative but to purchase air compressors elsewhere. On November 7, Petrochem replied to Ivey's referring to G–D's change of quotation:

We are nun the less [sic] calling upon them to make delivery as per your purchase order of October 6, 1977. We will advise of their response as soon as they make it available to us. We will be happy to assist you in working out a solution to your compressor supply problem. (Hayes' Dep.Ex. 12)

A factual dispute appears as to whether G–D's representatives had ample opportunity, if any at all, to review the project's plans and specifications held by Petrochem before issuing the original quotation. G–D's agents said they had none, while Petrochem's agents maintained that G–D did review, to their satisfaction, the plans and specifications before issuing the initial quotation.

The undisputed evidence shows that Petrochem had never had business relations with G–D prior to this quotation, that it handled, sold and distributed compressors, equipment and related supplies from manufacturers other than G–D; that it had no contractual relation with G–D as a manufacturer's representative, nor did it propose to act as the agent of G–D in any quotations made to Ivey's or any other contractor. In short, Petrochem was a business enterprise having no connection whatever with G–D, the manufacturer, except when it acted to obtain price quotations from the latter's representatives.

Upon Petrochem's failure to supply the equipment, Ivey's purchased the compressors from Ingersoll-Rand for a price of $121,000. Ivey's thus seeks to recover nearly $32,000 as the difference between the original quotation which it received from

Petrochem and the amount it was required to pay to the other supplier for the identical equipment.

In its answer, Petrochem admits that it quoted a price of $89,073.62 for the air compressors, noting that it made this quotation after being assured by G–D that the air compressors would comply with the plans and specifications, with the exception of a valve design. Petrochem asserts that it notified Ivey's of the mistake in the original quotation which it received from G–D before receiving Ivey's purchase order and that when G–D refused to honor its original bid to Petrochem, the latter was unable to perform in accordance with its original bid to Ivey's. Petrochem pleaded that the oral proposal made by it to Ivey's was unenforceable because of Mississippi's applicable statute of frauds as contained in the Uniform Commercial Code (UCC). Petrochem also cross-claimed against G–D for any judgment cast against it in favor of Ivey's, as well as for loss of profits. G–D also denies any liability to Ivey's, asserting lack of privity to any negotiations between Petrochem and Ivey's and claiming that it was not liable for Petrochem's acts or breach of contract, if any. G–D also invoked the statute of frauds as an affirmative defense to Ivey's claim; it, in turn, cross-claimed against Petrochem for judgment over in event it was held liable to Ivey's. As heretofore stated, these motions for summary judgment have been filed only by the two defendants, Ivey's not having moved for summary judgment against either. We shall deal first with G–D's motion for summary judgment and next with Petrochem's.

### (a) G–D's motion for summary judgment against Ivey's.

The uncontradicted facts, as established by the evidentiary materials presented to the court, show that G–D and Petrochem are distinctly separate business enterprises, having no relationship of principal and agent with each other. G–D is the manufacturer of a line of goods, including compressors and auxiliary equipment; Petrochem is a wholesaler, offering to its customers different lines of goods supplied to it by order from different manufacturers, one of whom was G–D. In fact, the quotation in question which G–D gave Petrochem was the only contact which Petrochem ever had with G–D, and while obtaining such quotations from G–D, Petrochem was concurrently seeking quotations for compressor equipment from manufacturers in competition with G–D. Ivey's has failed to tender any factual issue as to whether a principal-agent relationship existed between G–D and Petrochem. Indeed, the undisputed evidentiary materials show that Petrochem operates independently of G–D, without any common agents or employees, and engages in no type of business relationship as principal and agent. The evidentiary materials show, without dispute, the opposite to be the case, with the result that G–D may not be held liable to Ivey's on any theory of vicarious responsibility for the acts of Petrochem.[1]

■ It is equally clear that G–D was not a party to any negotiations, estimates or dealing which Petrochem had with Ivey's, nor was it a party to any contract which Ivey's might have entered into with Petrochem. On the contrary, Petrochem was a potential customer of G–D's, who had no knowledge or control of what figures Petrochem might use by way of markup in any bids submitted to Ivey's. Ivey's claim that it has standing to maintain an action

---

1. In reaching this conclusion, we are guided by the principle that the factual elements of an agency relation are threefold:

   (1) Manifestation by the principal, by either his words of his conduct or both, that the agent shall act for him, (2) the agent's acceptance of the undertaking, and, most critically, (3) the understanding of the parties that the principal is to be in control of the undertaking.

*Butler v. Bunge*, 329 F.Supp. 47, 55 (N.D.Miss. 1971). Moreover, "[t]here can be no apparent authority to act where an agency relationship, either actual, express, or implied, does not exist." *XYOQUIP, Inc. v. Mims*, 413 F.Supp. 962, 966 (N.D.Miss.1976). Nothing in this record bring plaintiff's relation with G–D within these established principles of agency.

based upon contractual relations or negotiations between Petrochem and G–D is not cognizable under Mississippi law. Although privity of contract as a prerequisite for suit has been eroded in certain aspects of the law of negligence and other fields of jurisprudence, it nonetheless remains an essential ingredient for claims based upon breach of contract. *Delta Construction Company of Jackson v. City of Jackson*, 198 So.2d 592 (Miss.1967); *King v. Hankins*, 209 So.2d 190 (Miss.1968). *See also*, 17 A C.J.S. *Contracts* § 518 at 940; 19 Am.Jur.2d § 297 at 714.

■ Nor can Ivey's fare any better by contending that at the very least, it should be regarded as a third-party beneficiary of any contract, assuming one was made, between Petrochem and Ivey's. To achieve the status of a third-party beneficiary and thereby avoid the requirement of contract privity, the Supreme Court of Mississippi has expressly held that the plaintiff must show that

> the condition which is alleged to have been broken was placed in the contract [between third parties] for his direct benefit. A mere incidental beneficiary acquires by virtue of the contractual obligation no right against the promisor or the promisee.

*Hartford Accident & Indemnity Co. v. Hughes*, 190 Miss. 225, 199 So. 93, 95 (1940); *Engle Acoustic & Tile, Inc., v. Grenfell*, 223 So.2d 613 (Miss.1969).

■ In the case sub judice, Ivey's has utterly failed under the evidentiary material submitted to show that it enjoys the status of a third-party beneficiary in any contractual negotiations between Petrochem and G–D.

■ We are mindful that summary judgment should be sparingly awarded and not be granted wherever there is either a genuine issue of material fact or whenever inferences arising from testimony have to be weighed to reach a conclusion, or where the law is doubtful or otherwise unsettled. Nevertheless, the Rule 56 summary judgment procedure has viability, and is to be utilized where it clearly appears, as is the case here, that the facts are undisputed, the principles of law are settled and no useful purpose would be served by requiring the parties to go to plenary trial over the issues raised by the motion for summary judgment. We therefore hold that since Petrochem was not the agent of G–D, and since G–D was not in privity with any negotiations had between Ivey's and Petrochem, and Petrochem was in no sense a third-party beneficiary of those negotiations, it is unnecessary to address the additional defense raised by G–D relative to the statute of frauds. G–D is clearly entitled to summary judgment in its favor against Ivey's, and its motion therefor shall be sustained.

(b) G–D's motion for summary judgment against Petrochem; Petrochem's cross-claims for indemnity and for lost profits.

■ G–D's motion for summary judgment against the cross-claim of Petrochem is based upon the sole ground that any negotiations between the parties—G–D and Petrochem—are unenforceable because of the Mississippi statute of frauds pertaining to the sale of goods as contained in the state's Uniform Commercial Code, § 75–2–201, Miss.Code Ann. (1972), and set forth below.[2] Concededly, both G–D and Petro-

---

**2.** (1) Except as otherwise provided in this section, a contract for the sale of goods for the price of five hundred dollars ($500.00) or more is not enforceable by way of action or defense unless there is *some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.* A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph *beyond the quantity of goods shown* in such writing.

(2) *Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents*, it satisfies the requirements of subsection (1) against such party *unless written notice of objection to its contents is given within ten (10) days after it is received.*

chem are "merchants" within the Code's meaning, and the negotiations for the sale of the air compressors and equipment were for a "sale of goods" as defined by the Code.

Three arguments are made, or could be advanced, on behalf of Petrochem that its negotiations with G–D are enforceable notwithstanding the statute of frauds. These contentions may be summarized as follows: first, G–D allegedly admitted in its answer or by its agents' depositions that a contract for sale was made, thus invoking the exception provided in underscored subsection (3)(b) of § 75–2–201; second, that the evidence showed, apart from oral negotiations, a writing signed by Theriot, G–D's authorized agent, "sufficient to indicate that a contract of sale was made" between Petrochem and G–D; and, third, that the quoted statute of frauds does not apply where the facts justify the application of the doctrine of promissory estoppel. We shall carefully examine each of these contentions.

As to the claim that G–D admitted, in its responsive pleading, that a contract was made between it and Petrochem, G–D set forth as an affirmative defense in its answer, ¶ 18, that it had orally quoted a price for the compressor equipment to Petrochem "based on oral information given to [G–D's] employee by Petrochem's employee"; that G–D's employee was not allowed to examine the plans and specifications, although he requested permission for such study, and was forced to rely upon oral representations of Petrochem concerning the plans and specifications, which G–D subsequently discovered had not accurately represented what was provided in the plans and specifications. Paragraph 18 then alleges that G–D immediately notified Petrochem of the mistake which had occurred as a result of the nondisclosure of the plans and which caused G–D, after having an opportunity to study the same, to submit to Petrochem a revised written quotation. While Petrochem denies that it withheld the correct information regarding the job's plans and specifications and asserts that it afforded G–D's agents full opportunity to make adequate study thereof before issuing its original bid, it is indisputably clear that G–D's answer does not contain an unqualified or unconditional admission of any facts which would constitute the formation of a valid, oral contract. Instead, G–D's allegations affirmatively show that, insofar as G–D was concerned, it was induced to make its original quotation on the basis of erroneous information supplied by Petrochem. Pleadings of this nature may hardly be viewed as "an admission in its pleadings" so as to invoke subsection (b). Nor does the deposition testimony of Robert Theriot and Jonathan H. Beeson admit such facts as would constitute a contract for the sale of goods; rather, their testimony hews to the allegations contained in G–D's answer.[3] Most assuredly, there is a factual dispute as to whether Petrochem misled G–D or refused to provide G–D an opportunity to review the plans and specifications before making its original bid, and summary judgment on any such factual issue would be inappropriate. All we are presently holding as a

---

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

(a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

(b) *if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made,* but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

(c) with respect to goods for which payment has been made and accepted or which have been received and accepted. (Our emphasis).

**3.** In his deposition, Theriot merely admits that on or about September 19, 1977, Petrochem's representative told him that the contract would probably be awarded to Ivey's and that the order for the air compressors would probably be forthcoming from Petrochem (Theriot Dep. at 42–43). We find this to be wholly insufficient to constitute an admission that the contract of sale was made.

matter of law is that Petrochem cannot invoke subsection (b) to contend that an admission was made in G–D's pleadings or by testimony of its agents conceding facts which otherwise would constitute an oral contract for the sale of goods made by G–D.

Next, we address Petrochem's contention that the estimate which G–D's agent, Theriot, signed September 12, 1977, giving a quotation for two compressors with auxiliary equipment constituted a "writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." Unquestionably, Theriot was the authorized agent of G–D, and the quotation for the two compressors with auxiliary equipment was both dated and signed by Theriot. This document, entitled "Estimate Sheet," was delivered by G–D, knowing that it would most likely be used by Petrochem in making a quotation to Ivey's for the shop air compressors called for in the plans and specifications of the Navy project. In *Fortune Furniture Mfg. Co. v. Mid-South Plastics*, 310 So.2d 725 (Miss.1975), the court held that for a memorandum to take a case outside the Uniform Commercial Code's statute of frauds, (a) it must evidence a contract for the sale of goods, (b) it must be signed by the party against whom enforcement is sought, and (c) it must specify a quantity. It is readily apparent that the written quotation is not itself an evidence of a contract for the sale of goods; additionally, it specifies not five, but two air compressors with their auxiliary equipment. Though cases have held that a memorandum functions only as evidence of a contract and need not contain every term, the statement of quantity is plainly vital to the validity of the contract. In no event could the memorandum in the instant case suffice to cover more than two compressors with the designated related equipment. If such an effect were given to Theriot's memorandum, it would, of course, defeat G–D's

motion for summary judgment against Petrochem's cross-claim for damages incurred by reason of G–D's failure to deliver two compressors with auxiliary equipment in accordance with the original quotation. The more basic question, however, is whether a quotation or estimate by a seller is irrevocable for a reasonable period of time or whether it is simply an offer to sell which is subject to revocation by the seller at any time prior to the buyer's acceptance. The pertinence of this question is made clear when it appears, without contradiction, that prior to Petrochem's acceptance of the original quotation, G–D, on September 26, 1977, following telephone conversations with Petrochem concerning the mistake which it purportedly made in its original quotation, issued a revised written quotation, No. 231–97, at a substantially higher price. This revised quotation can be viewed only as a withdrawal, or revocation, of its original offer to sell at the lower price. It is settled by explicit provision of Uniform Commercial Code that a merchant's quotation, or estimate, or other offer, to be irrevocable for a reasonable length of time, must *by its terms give assurance that it will be held open*. Miss.Code Ann. § 75–2–205 (1972).[4] Otherwise, a mere offer lacking such assurance is subject to revocation by the seller at any time prior to the buyer's acceptance. Although Mississippi has not construed this section of the code, the decisions elsewhere firmly support this view. Cases squarely in point are *E. A. Coronis Associates v. M. Gordon Const. Co.*, 90 N.J.Super. 69, 216 A.2d 246; *Janke Const. Co. v. Vulcan Material Co., infra*, 386 F.Supp. at 691–92. As explicated in *Coronis*, this section reverses the common law rule that any offer not supported by a consideration may be revoked at any time prior to acceptance. *Premier Elec. Const. Co. v. Miller-Davis Co.*, 422 F.2d 1132, 1135 (7 Cir. 1970) (a pre-code case). *See also* 1 Williston, *Contracts* § 55, at 176 (1958). Theriot's written estimate

4. Since the U.C.C. provides that, to constitute a "firm offer" for the sale of goods, it must *expressly* give assurance that the offer will be held open, we reject the contention that a "firm offer" may arise by implication from the mere fact of the buyer's reliance thereon to his detriment.

contains no assurance, or signification of any kind, that the quotation would be held open for any period of time. It constitutes, at best, a mere offer subject to revocation at the will of the seller, unless previously accepted by the buyer.

■ Thus, Petrochem was fully advised that G–D's original quotation offer, which was not firm by its terms, had been effectively withdrawn prior to any attempt by Petrochem to place a purchase order with G–D. The record shows without contradiction that it was not until after Petrochem received a purchase order from Ivey's on October 6, that it attempted, on October 24, 1977, to submit to G–D a purchase order based on the original but withdrawn quotation. At this point, G–D, by letter signed by J. L. Smith, G–D's district manager, returned Petrochem's purchase order stating "we cannot accept this purchase order since it is not conformative with our quotation No. 231–97 dated September 26, 1977." Petrochem thereafter appealed to G–D for some adjustment or to seek an accommodation with the prime contractor or the job manager of the project but this proved to be unavailing. In summary, the "writing" which Petrochem claims to be "sufficient to indicate that a contract of sale has been made between the parties [G–D and Petrochem]" was at best a mere offer which had been effectually revoked by G–D at a time when it had the lawful right to do so.

We next consider Petrochem's claim that the facts of this case establishing that Petrochem issued to Ivey's a quotation relying upon G–D's prior quotation to it, creates a case of promissory estoppel, in that Petrochem, if held responsible to Ivey's, would have been directly misled, to its financial detriment, by G–D's promise. Petrochem urges, with vigor, that promissory estoppel is a recognizable doctrine of sufficient force to prevent the opposite party from invoking the statute of frauds as a defense. Petrochem cites respectable authority for its po-

sition, e. g., *Janke Const. Co. v. Vulcan Materials Co.*, 386 F.Supp. 687, aff'd. 527 F.2d 772 (7 Cir. 1976) (construing Wisconsin's Uniform Commercial Code); *Loranger Const. Corp. v. E. F. Hauserman Co.*, 374 N.E.2d 306 (Mass. Court of Appeals, 1978); *McIntosh v. Murphy*, 469 P.2d 177 (Haw. 1970). See note, 48 Miss.L.J. 883, 887 (1977). The rationale for this view is that particularly in the construction bidding process, and because of prevailing, customary business practices in the industry, it is foreseeable that the general contractor will rely on the lowest sub-bid in the calculation of its prime bid. Given this business reality, these courts invoke promissory estoppel, usually in terms of the rule as stated in Restatement (Second) of Contracts, § 90, at 215,[5] to prevent an injustice resulting to a promisee by the invocation by the promisor of the statute of frauds as a defense to an oral promise.

■ If we were writing on a clean slate, unfettered by an obligation in this diversity action to look to the substantive law of Mississippi, Petrochem's position would have strong appeal. *Erie*-bound, we look at Mississippi's stance in statute of fraud cases and find that it strongly disfavors the creation of judicially engrafted exceptions. In fact, the state's Supreme Court has consistently rejected efforts to avoid the plain thrust of the statutory language. Contrary to the rule in some states, Mississippi does not recognize part performance as an exception to the statute of frauds. *Affiliated Investments, Inc. v. Turner*, 337 So.2d 1263 (Miss.1976) (involving an oral contract 75% complete); *Stahlman v. National Lead Co.*, 318 F.2d 388 (5 Cir. 1963).

Although promissory estoppel, when not encountering the defense of statute of frauds, has been applied in Mississippi jurisprudence, two cases are strikingly apposite that the doctrine cannot stand if the case is one falling within the statute of frauds.

---

5. A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by

enforcement of the promise. The remedy granted by breach may be limited as justice requires. [Restatement (Second) of Contracts § 90, at 215 (Tent. Drafts Nos. 1–7, 1973)].

*Tanner v. Walsh*, 184 Miss. 147, 183 So. 278 (1938), refused to allow the lessee under an oral agreement to enforce the lease, subject to a valid defense of the statute of frauds, although the lessee had made expenditures upon the leased premises in reliance upon the oral agreement. Rejecting a plea of promissory estoppel, the court held that the statute of frauds could not be so interpreted because "this Court, contrary to the course pursued by some others, has uniformly held that it is without power to engraft exceptions on the statute, and must enforce it as written," 183 So. at 279. *Thomas v. Prewitt*, 355 So.2d 657 (Miss. 1978), is squarely in point since it interprets Miss.Code Ann. § 75–8–319 (1972), the section of the statute of frauds relating to the sale of securities,[6] the language of which is essentially identical to that governing the sale of goods under Article 2.[7] The court firmly rejected equitable estoppel as an avoidance of the defense based upon the statute. The court restated that nonstatutory exceptions to the writing requirement of the statute of frauds are not looked upon with favor in this state. *Delta Lumber Co. v. Wall*, 119 Miss. 350, 80 So. 782 (1919). Although *Prewitt* did not involve a sale of goods, its rationale for construing Article 8, Statute of Frauds, inevitably applies to Article 2, Statute of Frauds, relating to the sale of goods. The court noted, and disposed of the general provisions of, § 75–1–103, 203, as providing a basis for estoppel as a nonstatutory exception.[8]

A case directly in point is *C. R. Fedrick, Inc. v. Borg-Warner Corp.*, 552 F.2d 852 (9 Cir. 1977), applying California's Uniform Commercial Code, the statute of frauds section appearing to be the same as Mississippi's. In that case, *Borg-Warner*, a supplier of pumps, made an oral quotation to Fedrick, the prime contractor to supply pumps for $826,550, or at least $450,000 lower than the next low bid for the pumps. Three weeks later, the supplier gave a written quotation of $1,114,572. Fedrick, claiming it had relied upon the original oral quotation given by Borg-Warner and reduced its bid by $200,000 on the faith of the oral quotation, obtained the contract, and sued Borg-Warner for damages by having to purchase the pumps at a higher price from other sources. The court rejected Fedrick's claim of reliance of promissory estoppel as enunciated in the landmark case of *Drennan v. Star Paving Co.*, 51 Cal.2d 409, 333 P.2d 757 (1958). Affirming the court below, the Ninth Circuit held:

The District Court laid considerable stress upon the Arizona authority in *Tiffany, Inc. v. W. M. K. Transit Mix, Inc.*, 16 Ariz.App. 415, 493 P.2d 1220, 1225–26 (1972), and stated:

6. A contract for the sale of securities is not enforceable by way of action or defense unless
(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or
(b) delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or
(c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (s) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten (10) days after its receipt; or
(d) the party against whom enforcement is sought admits in his pleadings, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price.

7. § 75–2–201 provides: See note 2, *supra*.
For a recent decision evidencing Mississippi's strict adherence to the provisions of this statute where satisfaction of none of the legislatively specified exceptions was addressed, see *Austin v. Montgomery*, 336 So.2d 745 (Miss.1976).

8. Unless displaced by the particular provisions of the code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, *estoppel*, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

"Every contract or duty within this code *imposes an obligation of good faith in its performance or enforcement.*" (Emphasis orig.) 335 So.2d at 661–62.

"In that case, as in the instant proceeding, plaintiff-contractor sued a seller of construction materials for refusing to honor a previously submitted bid upon which plaintiff had relied. The court there considered the question of whether a contractor could 'avoid the defense of the Statute of Frauds by claiming damages on the theory of promissory estoppel.' *Tiffany, supra*, 493 P.2d at 1225. Relying on Restatement of Contracts § 178 and the law of other jurisdictions, as well as on various policy arguments, the court held that ' "the defense of the Statute of Frauds is only precluded when there has been (1) a *misrepresentation* that the Statute's requirements have been complied with, or (2) a promise to make a memorandum." '

"If the Court were free to adopt whatever rule it deemed best, regardless of past precedent, it might well follow the principle of the *Tiffany* case. That result seems to provide a reasonable balance between the two doctrines—encouraging businessmen to reduce their agreements to writing while mitigating the harsh effects which unswerving adherence to the Statute of Frauds might produce. In contrast, adopting the 'balance' advocated by plaintiff could render the Statute of Frauds a virtual nullity. See *Tiffany, supra*, 493 P.2d at 1226. . . .

"Thus, the rule is that '[t]he responsibility of the federal courts, in matters of local law, is not to formulate the legal mind of the state, but merely to ascertain and apply it.' *Yeder [Yoder] v. Nu-Enamel Corp.*, 117 F.2d 488, 489 (8th Cir. 1941). . . ."

We conclude that the Supreme Court of California in considering this issue would probably adopt the rationale, or a variation thereof, in *Tiffany* rather than render C.C.C. § 2201(1) and (2) a nullity by extending to vendor's oral bids for sale and delivery of specific goods the doctrine of estoppel as applied in *Drennan* and its progeny to subcontractors' *work and materials* oral bids. (Emphasis orig.) (citations omitted).

■ In our opinion, the Mississippi Supreme Court, if presented with the precise issue before us, would follow *Fedrick's* rationale and reject Petrochem's claim based on promissory estoppel. We thus conclude that G–D's motion for summary judgment in its favor on the cross-claim of Petrochem is well taken and should be sustained.

(c) Petrochem's motions for summary judgment against Ivey's.

■ There remains for consideration whether Petrochem is entitled, as a matter of law, to summary judgment on claims asserted against it by Ivey's. Consistent with the foregoing views, we readily dispose of certain contentions made by Ivey's. Promissory estoppel cannot be invoked by Ivey's to avoid Petrochem's defense based upon the U.C.C.'s Statute of Frauds. Admittedly, there is no writing of any kind executed by Petrochem in relation to the quotation which it made to Ivey's, nor does it appear without dispute that Petrochem has admitted facts which would form a contract enforceable under Miss.Code Ann. § 75–2–201(3)(b).

A serious factual issue, however, or at least an issue upon which inferences must be drawn, arises from what occurred at the meeting held on October 6 between Hayes, Ivey's vice-president, Wright and Beeson, Petrochem's representatives. We have heretofore quoted extensively from the deposition of Hayes as to what was said. We have also observed that no evidence has been offered as to the version of Lonnie Wright and Jonathan H. Beeson.

One of the crucial issues is whether, at this meeting, Petrochem unequivocally revoked its oral quotation, or whether Petrochem was expressing apprehension about the position taken by G–D in making a higher quotation. This issue, alone, is of such nature that full factual development is required to determine whether Petrochem did, in fact, withdraw its oral offer prior to Ivey's acceptance by its purchase order dated October 6 and presented to Petrochem

during that day's meeting. The conduct of Petrochem in failing to reject the purchase order within ten days and in placing a purchase order with G–D for the original quotation irrespective of G–D's express revocation as well as Petrochem's subsequent appeals to G–D for relief or adjustment may shed light on Petrochem's intention at the October 6 meeting. If the facts should be that Petrochem unqualifiedly withdrew its oral quotation prior to acceptance, Ivey's purchase order would be of no legal effect and Petrochem would be entitled to prevail. On the other hand, if the offer was not withdrawn, clearly and unequivocally, Ivey's purchase order would probably take the case out of the statute of frauds by virtue of § 75–2–201(2), since both Ivey's and Petrochem are merchants and the purchase order would constitute a writing "in confirmation of the contract and sufficient against the sender [Ivey's] is received and the party receiving it [Petrochem] has reason to know its contents," the statute of frauds' provision is satisfied against the receiving party "unless written notice of its objections is given within ten (10) days after it is received." We have no doubt Ivey's purchase order was sufficient to bind it, and that Petrochem on receipt thereof had reason to know its contents. The uncontradicted proof is that Petrochem did not give timely notice. Indeed, Petrochem gave no notice of objection for almost two months. Collateral to, but inextricably interwoven with, the question of the withdrawal of Petrochem's offer on October 6, are issues of fact existing in the record as to whether Ivey's orally accepted Petrochem's quote prior thereto so as to make Petrochem's October 6 oral revocation ineffective, on the one hand, as well as the issue of Ivey's alleged bid-shopping activity during this period on the other. For these reasons, we are of the opinion, and so hold, that Petrochem's motion for summary judgment against Ivey's should be denied. We note in concluding that in the event Ivey's should prevail on the merits, a serious question as to mitigation of damages will be presented by virtue of Ivey's subsequent rejection of other quotations substantially lower than the price it eventually paid for Ingersoll-Rand's compressors.

Let an order issue accordingly.