**J.T. GIBBONS, INC., Plaintiff-Appellant Cross-Appellee,**

v.

**CRAWFORD FITTING CO., et al., Defendants-Appellees Cross-Appellants.**

No. 82–3025.

United States Court of Appeals,
Fifth Circuit.

May 9, 1983.

McGlinchey, Stafford & Mintz, Dando B. Cellini, New Orleans, La., Mansour, Gavin, Gerlack & Manos Co., Ernest P. Mansour, Cleveland, Ohio, for Crawford & Lennon.

Dale, Owen, Richardson, Taylor & Matthews, Thomas E. Balhoff, Baton Rouge, La., for Capital Valve & Jennings.

Charles E. Hamilton, III, New Orleans, La., for Thomas Read & Co.

Before THORNBERRY, GEE and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

Plaintiff brought this antitrust suit under §§ 1 and 2 of the Sherman Act. 15 U.S.C. § 1 et seq. The defendants counterclaimed for malicious prosecution. The district court directed a verdict against plaintiff on the antitrust claims but allowed the malicious prosecution claim to go to the jury. The jury returned a verdict for plaintiff. Both sides appeal. We affirm the district court's disposition on all points.

### The Parties

Plaintiff is J.T. Gibbons, Inc. ("Gibbons") located in New Orleans. It is principally an exporter of a variety of goods, ranging from foodstuffs to valves and pipe fittings. The two principals of Gibbons are Cecil Keeney, chairman of the Board, and his son Richard, president.

Defendant Crawford Fitting Co. ("Crawford") is an Ohio-based corporation engaged in manufacturing valve and pipe fittings. Crawford's corporate structure includes a complicated system of separately incorporated manufacturing and warehousing subsidiaries. There are five manufacturing companies, producing different product lines. Crawford also has several incorporated regional warehouses, enabling it to reduce the lag time between receipt of orders and delivery of the product. Two of these warehouses are relevant to this suit: Southern Swagelok in Birmingham, Alabama and Microventil, the European ware-

Alioto & Alioto, Joseph L. Alioto, San Francisco, Cal., for plaintiff-appellant cross-appellee.

house located in Switzerland. All of these companies are owned and managed by two men, Fred Lennon and his nephew (by marriage), Francis Callahan.

Crawford's products are sold to end-users through a network of independent distributors, who buy at wholesale prices from the regional warehouses. There are two distributors named as defendants: Capital Valve and Fitting Co., in south Louisiana owned by Robert Jennings and Thomas A. Read & Co., located in Houston and owned by Thomas Read. Several other distributors are involved in this suit: Glasgow Valve and Aberdeen Valve, the Crawford distributors in Scotland; and Potomac Valve, a Maryland distributor.

## Background Facts

The valve and pipe fitting industry is a highly competitive industry. As of 1977, there were over 700 manufacturers of valves and pipe fittings. Crawford is not one of the four top companies in the industry, and the four top companies do not control even 20% of the market.

Crawford, to compete in the industry, devised a system of independent distributors. Its marketing strategy emphasizes the need for the distributor to service the product and the customer, by conducting safety meetings and inspecting or replacing damaged parts. As part of this strategy, Gibbons devised its 5% plan. This plan requires a distributor who ships the product into another distributor's territory to pay 5% of the invoice price to Crawford, who sends it to the second distributor. This payment is to compensate the second distributor for any service performed.

In 1977 the Keeneys acquired Gibbons. Richard Keeney had, prior to coming to Gibbons, worked as a salesman for Capital. Richard had Gibbons expand into sales of valves and pipe fittings and solicit business in Scotland and the North Sea area. In 1977 and the first half of 1978, Gibbons' sales expanded rapidly. Gibbons initially bought Crawford Products from Capital, and then shipped directly to Prestwick Airport in Scotland.

In May of 1978, however, Capital refused to deal further with Gibbons. Gibbons then approached Read, Crawford's Houston distributor, who also refused to deal with Gibbons. Gibbons then contacted Crawford directly, threatening litigation for these refusals to deal. Crawford responded by arranging a meeting and offer from Crawford's Birmingham distributor. Gibbons rejected this offer, and proposed that Crawford make it a distributor. Unbeknownst to Crawford, however, Gibbons had obtained another source of supply through Potomac Valve and Fitting, Crawford's Maryland distributor.

Plaintiff then brought this suit. It claimed: (1) that defendants' refusal to deal constituted an unreasonable restraint of trade; (2) that all defendants conspired to eliminate Gibbons' competition in the North Sea market; (3) that Crawford set resale prices for its distributors; and (4) that Crawford's subsidiary and manufacturing companies engaged in horizontal price fixing. Defendants counterclaimed for malicious prosecution alleging that Gibbons filed this suit to extort a distributorship from Crawford. The district court directed a verdict against plaintiff on all antitrust claims. The defendant's counterclaim went to the jury, who decided for plaintiff. Defendant's motions for judgment n.o.v. and for a new trial were overruled.

### I. The Antitrust Claims

#### A. Standard of Review

Preliminarily, we note that we review plaintiff's claims in light of *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the nonmover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a

contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied and the case submitted to the jury.

### B. Concerted Refusal to Deal

Gibbons claims that Crawford, Capital and Read engaged in a concerted refusal to deal. Gibbons argues that because Crawford had an equity interest in the Scottish distributorship, it had a motive to eliminate Gibbons' competition in the North Sea market. Gibbons then points to the specific evidence that Capital and Read refused to deal with Gibbons.[1]

In order to collect damages for a violation of § 1 of the Sherman Act: "plaintiff must prove (1) the existence of an agreement (2) which unreasonably restrains trade (3) to the damage of the plaintiff." *Abadir & Co. v. First Mississippi Corp.,* 651 F.2d 422, 424 (5th Cir.1981). Because we conclude that plaintiff has failed to prove any damage, we affirm the directed verdict.

Section 4 of the Clayton Act [15 U.S.C. § 15] provides that: "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may sue and recover treble damages. Thus, § 4 engrafts on any private cause of action proof of some damage or injury. We have described its requirements as:

> the plaintiff must prove that the defendants violated the antitrust laws, that this breach caused injury in fact, and, . . . the actual dollar amount of the damage.

*Jot-Em-Down Store (JEDS) Inc. v. Cotter & Co.,* 651 F.2d 245, 247 (5th Cir.1981). *See Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 852 (5th Cir.), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981).

Traditionally, somewhat different standards apply in proving the fact of damage versus the amount of damage. In *In re Plywood Antitrust Litigation,* 655 F.2d 627, 635 (5th Cir.1981), *cert. granted sub nom Weyerhaeuser Co. v. Lyman Lamb Co.,* 456 U.S. 971, 102 S.Ct. 2232, 72 L.Ed.2d 844 (1982), we described this difference as, "once anti-trust plaintiffs have proved the fact of damage, their burden on proving the measure of damages becomes lighter." Plaintiff must prove fact of damage by a preponderance of the evidence. *See* L. Sullivan, Handbook of the Law of Antitrust § 251 (1977) ("There has been no tendency to lighten plaintiff's burden [on the fact of damage]; the preponderance of the evidence rule applies in unqualified form.") Of course, since this case arises on a directed verdict, plaintiff need only show that reasonable minds could differ as to its proof of injury.

We do not think the Supreme Court's recent decision in *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) disturbed these differing standards of proof. The Court vacated our opinion directing a dismissal because of the plaintiff's failure to prove injury. The petitioner argued that its proof should have been evaluated in light of the more lenient standard for proving the amount of damages. The Court vacated because the lenient standard of proof is applied only once an antitrust violation has been proved and no finding on this issue had been made. The Court stated:

> If the court determines on remand that respondent did violate the Act, the court should then consider the sufficiency of petitioner's evidence of injury in light of the cases discussed above. We, of course, intimate no views as to how that issue should be decided. We emphasize that even if there has been a violation . . . petitioner is not excused from his burden of proving antitrust injury and damages.

1. An unspoken premise of this argument is that Crawford took some action to force both Capital and Read to cooperate in this scheme, since, as a practical matter, Gibbons did not compete with either Capital or Read. We need not dwell on the validity of this premise, however, given our disposition on the lack of damage.

It is simply that once a violation has been established, that burden is to some extent lightened.

451 U.S. at 568, 101 S.Ct. at 1930. This language could be construed as abolishing the differing standards of proof. We do not think, however, that the Court would have abolished such a well established rule without some discussion. We also note that both the majority and dissent cite *Story Parchment Co. v. Paterson Parchment Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), from which the distinction between the fact and the amount of damage arose. There is no indication that the majority intended to overrule *Story Parchment.*

We have not interpreted *Truett* as changing the *Story Parchment* rule. In *Truett* upon remand, we stated: "[o]nly when the plaintiff has demonstrated the fact of injury may the court be lenient in the amount of evidence required to prove damages." *Chrysler Credit Corp. v. J. Truett Payne Co.,* 670 F.2d 575, 582 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982).

Thus, the plaintiffs may not take advantage of the more lenient standards of proof in showing the fact of damage. We note however, that we have assumed for purposes of this discussion, that the defendants did in fact conspire to eliminate Gibbons' competition. As we stated in *Malcolm,* "[i]n cases where the defendants' acts are motivated by intent to injure the plaintiff, the inferential leap to the finding of fact of damage, is not great." 642 F.2d at 855. In light of the unique facets of this case, however, we find that this "inferential leap" cannot be made.

■ We start with the nature of the antitrust violation here: a refusal to deal. The *sine qua non* of the injury caused by a refusal to deal would be inability to obtain the product. From this failure to obtain the product would flow subsidiary consequences: loss of sales or market share because of the failure to sell or utilize the product.

**2.** In *Malcolm,* we held that the plaintiff in a refusal to deal case is not required to show a lack of alternative supply. Thus, it may well

Our first inquiry should therefore be, was Gibbons unable to obtain supplies of Crawford valves and pipe fittings? The answer to this question is clearly no. Gibbons stipulated that it never received an order for Crawford products which it was unable to fill.

This does not end our inquiry however. As we said in *Malcolm:*

a plaintiff who does tap an alternative source may still prove some injury if a change of suppliers results in other losses such as increased costs or decreased revenues.

642 F.2d at 863, n. 29. Thus, if plaintiff could show some damage from its having to switch from Capital to Potomac, it would have demonstrated sufficient injury in fact.

Plaintiff alleges three factors showing that switching suppliers damaged it: (1) increased costs in the price of the product; (2) longer transportation delays and delivery costs; and (3) evidence that Gibbons' sales in the North Sea decreased after Capital stopped selling to Gibbons. We deal with each of these contentions separately.

Appellant's strongest point is that in purchasing from Potomac, it paid Bernie Pemberton a commission of 1.5% to place Gibbons' orders with Potomac in Pemberton's name. This was done, according to Richard Keeney, because of his fear that Crawford would cut him off if it found out that the orders were from Gibbons.

We first note that there is no evidence that this subterfuge was necessary. In fact, by the time of trial, Gibbons was placing its orders directly with Crawford. In light of the fact that it may not be plaintiff's burden to justify this cost,[2] however, and that Cecil Keeney testified that Pemberton performed certain services that Gibbons' employees could have performed, we assume that the cost of Pemberton's commission must be figured in the cost to Gibbons of purchasing Crawford products through Potomac.

be Crawford's burden to disprove the reasonableness of this cost.

The record shows, however, that even adding Pemberton's commission to the actual cost of Gibbons' purchases, the cost was lower. This was due to the difference in Capital's and Potomac's "blanket" with Gibbons. A blanket is a discount to the customer based on the volume purchased. Even adding in Pemberton's commission, Potomac's cost to Gibbons was substantially cheaper.[3] Therefore, Gibbons was not damaged by increased costs in purchasing from Potomac.

Gibbons also claims that delivery time from Potomac to Scotland was longer than that from Capital to Scotland. Plaintiff relies on Richard Keeney's testimony that having Pemberton place the orders was not an efficient way to do business, and on deposition testimony by one of its customers, Simon Thornhill, that Gibbons' delivery time was longer in 1979 than in 1978.

This testimony does not raise a jury question. As we stated in *Truett,* "[c]onclusory statements by the plaintiff, without evidentiary support, as to the fact of damage caused by the alleged antitrust violation are not sufficient." 670 F.2d at 581. The only specific evidence produced in this case regarding processing time for filling orders and the transit time for those orders was produced by defendants. They showed through expert testimony that processing time, transit time, and transportation costs were actually faster and cheaper from Potomac than from Capital.[4] Thornhill's testimony is also not supported by the record. His statement that "it [delivery time] was longer in 1978 than in the first half of 1978"

contradicts his prior statements. Earlier in his deposition, Thornhill stated he always received fittings from Gibbons in the latter half of 1978 "in exact accordance with our requirement." He also stated that he had no idea what the average delivery time for products was from Gibbons. In light of defendant's testimony and plaintiff's failure to come forward with other than conclusory statements, reasonable men would have to find that utilizing Potomac did not impose any increased transportation costs or delays on Gibbons.

Gibbons bases much of its case on damages on evidence showing that after Capital refused to deal with Gibbons, Gibbons' rate of growth in the North Sea slowed substantially. Gibbons relies on *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 667–68 (5th Cir. 1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975), for the proposition that proof of injury by showing sales before and after the cutoff is accepted.

We first note that *Lehrman* dealt with the measurement of damages, not the fact of damage. Second, we think that given the admittedly unique facts of this case, this proof is irrelevant. As stated previously, the *sine qua non* of the refusal to deal here would be a failure to obtain the product, or increased costs or transportation delays. Since none of these consequences from the refusal to deal arose here, it follows that the before and after proof is irrelevant.

Another way of viewing the problem with the before and after evidence is in terms of causation. While Gibbons is not

---

**3.** From June 1978 to October 31, 1978, Gibbons placed $207,330.80 worth of orders with Potomac. Pemberton's commission would have been $3,110. The total cost of these same products through Capital would have been $212,699.56. Invoicing through Potomac was $2,253.76 cheaper overall. From November 1, 1978 to February 28, 1979, Potomac invoiced $149,869.25 to Gibbons. Pemberton's commission would have been $2,248. The cost of the same goods from Capital was $152,617.99. Purchasing through Potomac for this period therefore saved Gibbons approximately $500.

We also note that for some periods, Pemberton's commission was only 1%. Thus, the dif-

ference in cost between Capital and Potomac would be even greater.

**4.**

| | Average Delivery Time Per Shipment | Average Transportation Cost Per Shipment |
|---|---|---|
| Shipments to Scotland from: | | |
| Capital – New Orleans, La. | 12.1 days | $264.33 |
| Potomac – Rockville, Md. | 10.95 days | $222.70 |
| Shipments to Norway from: | | |
| Capital – New Orleans, La. | 12.3 days | $188.62 |
| Potomac – Rockville, Md. | 11.35 days | $160.83 |

required to prove that the refusal to deal was the sole cause of its business' decline, it must show that the refusal to deal was a material cause of the decline. *Malcolm,* 642 F.2d at 861. Since, as shown above, the refusal to deal caused no adverse effect on Gibbons' ability to obtain Crawford valves and fittings, the refusal to deal could not be a cause of Gibbons' decline in growth. Defendants also showed that this decline was caused by other factors. Gibbons had two main customers in the North Sea area: Roermateriel in Norway and Hydrasun in Scotland. The evidence showed that Roermateriel made a large purchase of pipes and fittings for inventory in the first half of 1978. In the second half of 1978 and 1979, because much of this product did not sell and because of a depression in Norway, Roermateriel reduced its purchases from Gibbons and ceased stocking Crawford valves and fittings. In regard to Hydrasun, Gibbons had agreed to sell only to Hydrasun in Scotland. Gibbons had therefore tied its fortunes to Hydrasun's, and any decrease in Gibbons' sales is directly attributable to a decrease in Hydrasun's business.[5]

■ · From the foregoing, it is clear that plaintiff did not submit sufficient "substantial evidence ... of such quality and weight that reasonable and fair-minded men ... might reach different conclusions" regarding the fact of damage. The district court properly directed a verdict against plaintiff on the refusal to deal claim.

### C. *Resale Price Maintenance*

Plaintiff claims that Crawford engaged in resale price maintenance. As evidence of this, plaintiff cites correspondence from Capital to Crawford indicating that Crawford established a "blanket" for Gibbons. There are two types of blankets: (1) a factory blanket between the distributor and the factory and (2) a customer blanket between the distributor and the customer. A factory blanket is noncancellable and commits the distributor to purchasing a specific quantity of valves or fittings. Capital argues that the correspondence refers to a factory blanket and gives rise to no inference of resale price maintenance. Gibbons responds that it is for the jury to decide whether the correspondence referred to a factory or a customer blanket.

Even assuming that the jury should have been allowed to draw this inference, Gibbons has not established all the elements of resale price maintenance. In *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107 (5th Cir. 1979) we discussed these elements:

> a case of illegal resale price maintenance is made out when a price is announced and some course of action is undertaken or threatened contingent on the willingness or unwillingness of the retailer to adopt the price. The action need not necessarily fit under the rubric "coercion", but it must involve making a meaningful event depend on compliance or non-compliance with the 'suggested' [sic] or stated price.

*Id.* at 1117–18, *quoting Butera v. Sun Oil Co.,* 496 F.2d 434, 436–37 (1st Cir.1974).

Gibbons argues that *Aladdin* does not control here, and that *Greene v. General Foods Corp.,* 517 F.2d 635 (5th Cir.1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976), shows that Gibbons does not have to prove some action by Crawford to enforce its resale prices. Gibbons' reliance on *Greene* is misplaced. *Greene* involved whether a distributor's participation in the price fixing barred its antitrust suit. The case addresses the *distributor's* actions, not the manufacturer's activities in enforcing its resale prices.[6]

Gibbons also advances *United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed.2d 1024 (1944) as support for its contention. Yet the Court there noted specifically that material deviations from the manufacturer's resale price would result in termination of the wholesaler's franchise. *Id.* at 719–20, 64 S.Ct. at 811–12.

---

**5.** We note that there is no evidence in the record of any anti-competitive activity's *effect* on Hydrasun's business.

**6.** Indeed, it was clear from the facts of *Greene* that a "meaningful event" did occur when the distributor ceased to comply—namely, General Foods terminated Greene's distributorship.

Applying *Aladdin* here, it is clear that the district court properly directed the verdict. There is no evidence that Crawford took any action to enforce its price list or even its suggested price to Capital. Gibbons approached four different Crawford distributors and received four different price quotations.

### D. *Horizontal Price Fixing*

Gibbons alleges that Crawford is guilty of conspiring to set the prices for its manufacturing subsidiaries and its regional warehouses. It is undisputed that Lennon and Callahan set the prices for all these companies. Lennon and Callahan also owned all the stock in these corporations. Gibbons argues, however, that since these entities were separately incorporated and at the same level in the distribution chain, the elements of a conspiracy to fix prices existed.

As a matter of law, it appears that a parent corporation may conspire with its subsidiaries, *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 244 (5th Cir.1978), and subsidiaries of the same parent may conspire. *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951). However, an important element in this capacity to conspire has been that the separate corporations be in the position of competitors. *Id., H & B*, 577 F.2d at 244. In *Las Vegas Sun, Inc. v. Summa Corp.*, 610 F.2d 614, 617 (9th Cir.), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980), the court explained:

> To determine whether corporate entities are separate enough to be capable of conspiracy, a court must examine the particular facts of the case before it (citations omitted). If the intra-enterprise entities "hold themselves out as competitors," the rule that they cannot avoid Sherman Act liability by hiding behind their common ownership and control is "especially applicable."

Applying these principles to the case before us, it is apparent that the directed verdict was proper. Gibbons produced no evidence that Crawford's manufacturing and warehouse subsidiaries either competed or held themselves out as competitors. The manufacturing subsidiaries each produced a separate product line that did not compete. The regional warehouses were limited to specific territories and there is no evidence that they competed for distributors' business. This lack of competition, in combination with the fact that this alleged conspiracy is, as a practical matter, the unilateral decision of the two men who own these companies, convinces us that the manufacturing companies and regional warehouses lacked the capacity to conspire.

### E. *Attempt to Monopolize*

Gibbons alleged a claim under § 2 of the Sherman Act for an attempt to monopolize the North Sea valve and pipe fitting market. The elements of an attempt to monopolize are: "(1) specific intent to accomplish the illegal result; and (2) a dangerous probability that the attempt will be successful." *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 276 (5th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). However, monopoly cannot be judged in a vacuum. A necessary backdrop to any § 2 attempt claim is the definition of the relevant product and geographic market. *In re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436, 441 (5th Cir.1982).

Gibbons asserts that the relevant product market here is the market for Crawford valves and fittings. The Supreme Court in *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) discussed at length the definition of the relevant product market. The Court stated: "[t]hat market is composed of products that have reasonable interchangeability for the purposes which they are produced—price, use and qualities considered." *Id.* at 404, 76 S.Ct. at 1012. The Court implied however, that the relevant product market could, under certain circumstances, be limited to one manufacturer's product.

This possibility has been discussed in later cases. In *Bushie v. Stenocord Corp.*, 460

F.2d 116, 121 (9th Cir.1972) the court stated:

A single manufacturer's products might be found to comprise, by themselves, a relevant market for the purposes of a monopolization claim, if they are so unique or so dominant in the market in which they compete that any action by the manufacturer to increase his control over his product virtually assures that competition in the market will be destroyed.

(Citations omitted). In *Associated Radio Service Co. v. Page Airways, Inc.,* 624 F.2d 1342 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981), we upheld a jury finding limiting the relevant product market to the outfitting of one particular model of airplane, instead of all similar aircraft. We held:

there was ample evidence of high entry barriers and of the difficulty outfitters encountered in switching back and forth from one model of aircraft to the next to allow the jury to find a relatively narrow market.

624 F.2d at 1349 (footnotes omitted).

Gibbons asserts two bases for defining the relevant product market as only Crawford fittings. First, that many of the fittings were patented. Second, that Crawford fittings are not compatible with its competitor's fittings, *i.e.,* that once installed, replacement parts must be from Crawford.

■ We think these facts are insufficient to raise a question for the jury. The fact that an article is patented does not affect the question of whether other products are reasonably interchangeable. For example, in *Du Pont,* the fact that cellophane was patented did not prevent the court from holding that the relevant product market could not be limited solely to cellophane.

■ Gibbons' second point, we think, is irrelevant. The evidence was overwhelming that the valve and pipe fitting industry was intensively competitive, and that there existed other valves or pipe fittings which performed the same functions for approximately the same price. The fact that Crawford fittings were not compatible with its competitor's fittings has no significance. For that matter, Ford cars cannot have GM parts installed on them, yet this does not mean that in determining the relevant product market, the product market may be limited solely to Ford cars.

■ Gibbons failed to define the relevant product market. We think, however, that as a matter of law, Crawford's evidence established the relevant product as all pipes and valve fittings. As part of the attempt claim however, Gibbons needed to prove a dangerous probability that the attempt would be successful. Given the competitive nature of the valve and pipe fitting industry, and Crawford's small share of that market, as a matter of law there was no dangerous probability of success. We therefore affirm the district court's directed verdict on the attempt to monopolize claim.

### F. *Conspiracy to Monopolize*

■ The elements for a conspiracy to monopolize offense under Section 2 differ from the attempt offense. Plaintiff must prove:

(1) the existence of a combination or conspiracy; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect upon a substantial amount of interstate commerce; and (4) the existence of specific intent to monopolize.

*Cullum Electric & Mechanical, Inc. v. Mechanical Contractors Association of South Carolina,* 436 F.Supp. 418, 425 (D.S.C.1976), *affirmed,* 569 F.2d 821 (4th Cir.1978), *cert. denied,* 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255 (1979). 3 J. Von Kalinowski, Antitrust Laws & Trade Regulation § 9.02[1] (1982).

There is some uncertainty within this circuit as to whether a plaintiff need prove the relevant product and geographic market in a conspiracy claim. The rule in other circuits is that such proof is not required. *Salco Corp. v. General Motors Corp.,* 517 F.2d 567, 576 (10th Cir.1975) ("Specific intent to monopolize is the heart of a conspir-

acy charge, and a plaintiff is not required to prove what is the 'relevant market.' "); *see United States v. Consolidated Laundries Corp.,* 291 F.2d 563 (2d Cir.1961). Our cases have not spoken to this issue specifically. In *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 851 (5th Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976), however, we did state in regard to a conspiracy claim that: "a jury could reasonably have found that Coca Cola did not have the specific intent to prevent Bubble-Up from obtaining lemon-lime franchises *in the relevant market".* It may be that even in a conspiracy claim under Section 2, plaintiff must prove the relevant market.

 We need not delve into this rather murky area of antitrust law however, because of our holding regarding plaintiff's Section 1 conspiracy claim. While a conspiracy claim under Section 1 is different from a similar claim under Section 2, *see United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 845 n. 59, 84 L.Ed. 1129 (1940), the requirement of injury in fact under Section 4 of the Clayton Act applies equally to Sections 1 and 2. Since Gibbons did not prove any injury for its Section 1 conspiracy it follows that the exact same actions would not constitute injury under Gibbons' Section 2 conspiracy.

## II. *The Cross Appeal*

Appellees contest the district court's entry of the verdict on the malicious prosecution counterclaim. They assert two grounds for reversal: (1) that the special interrogatories contained erroneous statements of the law; and (2) that the district court should have granted appellees' motion for new trial because of opposing counsel's prejudicial argument. We address each issue separately.

### A. *Malicious Prosecution*

The malicious prosecution issue was presented to the jury by special interrogatories. The ones relevant to this appeal are:

(1) Did Gibbons bring this lawsuit in good faith after full disclosure of the facts within the knowledge of Messrs. Richard and Cecil Keeney to their attorneys?

(2) Did Gibbons bring this lawsuit in bad faith for the purpose of obtaining a distributorship arrangement from Crawford?

The jury was told that if it responded "yes" to the first interrogatory it should not proceed to the second interrogatory.

Defendants argue that under Louisiana law, the first interrogatory is erroneous. Crawford asserts that under Louisiana law, good faith and full disclosure to one's attorney are discrete elements, *i.e.,* that even if the Keeneys informed their attorneys of all the relevant facts, the Keeneys are still liable if their purpose in bringing the suit was to extort a distributorship from Crawford and not to vindicate any legal rights that their attorneys told them had been violated.

 We decline to speculate on Louisiana law in this area, because defendants waived their right to protest any error. Federal Rule of Civil Procedure 51 governs objections to the court's charge, stating:

[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict ...

Defendants concede that they did not object to the form of the first interrogatory or the order in which the questions were submitted. They argue, however, that subsequent events during the course of the jury's deliberations restored their right to object.

After the jury retired, they sent a series of questions to the judge regarding the definition of good faith in the first interrogatory. After receiving the first request from the jury, the district court discussed the charge and gave the jury several definitions of good faith.[7] Defendants at this juncture again did not object to the charge.

7. We note that the district court's description of the issue comported with defendant's contention on appeal. There is no indication from

reading the instruction that full disclosure equaled good faith. For example, Judge Palmieri said:

The court received a second inquiry from the jury, stating: "Judge, we agree that Gibbons gave all of the information to their attorneys, however, we can't agree on the term good faith." It was at this point that counsel objected to the interrogatories and suggested that the jury answer the second interrogatory even if they answered the first interrogatory "yes." The district court overruled the objection stating: "There is too much water over the dam for me to give this instruction."

Defendants argue that this case falls within the rule of *Alverez v. J. Ray McDermott & Co.*, 674 F.2d 1037 (5th Cir.1982) and *Mercer v. Long Mfg. N.C., Inc.*, 671 F.2d 946 (5th Cir.1982). These cases are inapposite. They deal with whether failure to make a motion to resubmit jury issues waives the point on appeal when the jury has reached inconsistent answers to special issues. These cases deal with a situation not covered by Rules 49 and 51. Here, the express terms of Rule 51 govern, and defendants waived their objection.

Defendants advance one other argument to avoid the consequences of their failure to

object. They argue that the district court, in answering the jury's second question, essentially redefined the second issue and told the jury it could equate full disclosure with good faith.[8]

We disagree. The court, after a prolonged discussion with counsel, decided to repeat his earlier instructions, which did not equate good faith and full disclosure. Secondly, a fair reading of Judge Palmieri's statement convinces us that the instructions did not redefine this issue.[9] Lastly, we note that defense counsel did not object to the language allegedly equating good faith and full disclosure. If Judge Palmieri misspoke, a prompt objection could have cured the error. We therefore hold that the defendants waived any errors in the interrogatories, and the entry of the jury's verdict was proper.[10]

### B. *Prejudicial Closing Argument*

Defendants argue that the district court erred in denying their motion for new trial. This motion was based on the prejudicial nature of opposing counsel's closing argument. We affirm the district court's denial of this motion.

---

I also told you that you could find that there was full disclosure by the Keeneys if there was a conscientious attempt by them to tell their attorneys ... whatever they knew about the case, whether the Keeneys acted *in good faith for the purpose* of seeking guidance from the attorneys, *and* whether they made a full and complete report to them are questions for you to determine.

8. Defendants rely upon the following section of Judge Palmieri's discussion:

The problem as I see it is for you to determine whether in making this disclosure to the attorneys they were setting in motion a series of legal events which added up to a legal process that was all done for a collateral and ulterior purpose.

If that was done for that purpose, if this was all set in motion for the purpose of coercing the defendants to make a distributorship arrangement, with Gibbons, then it would be a bad motive; it would not be good faith.

If, on the other hand, the full disclosure was made to the attorneys, *irrespective of any such motivation,* and *solely for the purpose of vindicating the rights which they had based upon that full disclosure,* then there would not be any question of bad faith or the absence of good faith .... (Emphasis ours)

9. Judge Palmieri in discussing this issue with counsel said:

if they [the Keeneys] put facts before the attorneys but really not intending to do anything except to force these defendants into giving them a distributorship, they were not seeking advice in good faith; they were seeking to abuse legal process for an ulterior purpose.

This indicates that Judge Palmieri did not, at least at this point, equate good faith and full disclosure.

10. Defendants also assert that, the district court should have granted judgment n.o.v. on this issue. We think that, applying the *Boeing* standard, reasonable men could reach different conclusions regarding the motives of the Keeneys in bringing this lawsuit. While there was much evidence that the Keeneys brought this suit to extort a distributorship, the Keeneys testified to the contrary. Such credibility choices are traditionally the province of the jury. *Doucet v. Diamond M. Drilling Co.*, 683 F.2d 886, 889, n. 2 (5th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983).

Our standard of review on this issue is necessarily limited:

[i]t is well established that a motion for new trial based upon inflammatory remarks is addressed to the sound discretion of the trial judge, and his ruling thereon will not be disturbed absent an abuse of that discretion.

*Meyers v. Moody,* 693 F.2d 1196, 1220–21 (5th Cir.1982).

The district court, in a lengthy opinion agreed that opposing counsel's argument was prejudicial,[11] but found that countervailing considerations indicated that the motion should be denied. These considerations were: (1) the court's instruction to the jury; (2) defense counsel's ability to reply to plaintiff's allegations; and (3) this was not a case which tended to incite the jury's emotions.

We agree with the district court's characterization of the argument as prejudicial. We cannot, furthermore, say that the district court abused its discretion in denying the new trial motion. The court's lengthy instruction to the jury made it clear that the jury was to decide the case on the evidence and not the statements of counsel. Defense counsel did answer many of opposing counsel's charges and responded effectively to opposing counsel's argument of its antitrust claims.

Defendants assert that *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276 (5th Cir.1975) and *Draper v. Airco, Inc.,* 580 F.2d 91 (3d Cir.1978) mandate reversal. In both cases the court reversed the district court's denial of a motion for new trial. The court in *Draper,* for example stated:

Counsel for the plaintiff breached a number of the rules of proper argument. Specifically, he committed the following improprieties: (1) he attempted to prejudice the jurors through repeated inappropriate references to the defendants'

wealth; (2) he asserted his personal opinion of the justness of his client's cause; (3) he prejudicially referred to facts not in evidence; and (4) without provocation or basis in fact, he made several prejudicial, vituperative and insulting references to opposing counsel.

580 F.2d at 95. Defendants argue that opposing counsel's remarks fit the improprieties set out in *Draper.*

The district court acknowledged the force of these cases, but distinguished them because they involved wrongful death actions by individuals against large corporate defendants. Defendants argue that this distinction is irrelevant and the law should treat the individual and the corporation equally. We agree with the district court, however. This distinction does not treat the parties differently. Instead it looks to the jury and the potential prejudicial/inflammatory effects that the remarks may have. The purpose of the district court's inquiry is to determine whether the remarks were prejudicial, and if so, were they so prejudicial as to require a new trial. This inquiry does not proceed in a vacuum—it must be undertaken in light of the totality of the circumstances—including, among other things, the relative positions of the parties. The district court properly denied the motion for new trial.

The judgment of the district court is, in all respects,

AFFIRMED.

---

11. The district court made clear in no uncertain terms that Gibbons' counsel had overstepped the bounds of proper closing argument. The court stated:

At times, counsel for plaintiff presented arguments and made references to defendants based on facts wholly unsupported by the record and unduly inflammatory in nature ... [P]laintiff's counsel repeatedly characterized defendants ... in a manner prejudicial to defendants. Defendants were repeatedly referred to, explicitly and implicitly, in terms denoting unsavory and illegal characteristics ....