**H & W INDUSTRIES, INC., Plaintiff,**

v.

**FORMOSA PLASTICS CORPORATION, USA, Formosa Plastics Corporation Texas and J–M Manufacturing Company, Defendants.**

No. EC87–382–NB–D.

United States District Court,
N.D. Mississippi, E.D.

Feb. 22, 1988.

On Motion To Reconsider May 13, 1988.

John M. Edgar, Ronald L. Holt, Kansas City, Mo., James R. Moore, Jr., Jackson, Miss., H. Scot Spragins, Oxford, Miss., for plaintiff.

Thomas J. Suszek, Oxford, Miss., for defendants.

## MEMORANDUM OPINION

BIGGERS, District Judge.

Comes now before the court the motion of the plaintiff, H & W Industries, Inc. ("H & W"), seeking a preliminary injunction against the defendants, Formosa Plastics Corporation, USA and Formosa Plastics Corporation, Texas ("Formosa"). Having considered the evidence, the parties' memoranda, and being otherwise fully advised of the premises, the court is in a position to rule on the merits.

### I.

In 1978, Randy Heath began H & W Industries in Booneville, Mississippi to produce PVC pipe. H & W made the pipe by taking resin it purchased, adding materials to it, and forming pipe by a plastic extruding machine. Soon after Heath built the plant, H & W established another facility in Springfield, Kentucky.

In 1981, Heath traveled to the Formosa Plastics headquarters in Florham Park, New Jersey to discuss a resin supply contract. Heath met with the chairman and vice-president of Formosa, Y.C. Wang and Robert Chou. At the meeting Heath agreed that H & W would purchase a portion of its resin needs from Formosa.

On August 17, 1983, Formosa and H & W signed an "evergreen" contract in which Formosa agreed to supply H & W 4,000,000 pounds of resin each month. The contract contained a provision which stated the contract could only be modified by an agreement signed by both parties. It also included a clause which provided the contract could be cancelled 120 days after receipt of written notice.

In 1983, Formosa formed a subsidiary, J–M Manufacturing ("J–M") which purchased eight PVC pipe plants from Johns–Manville Corporation. Initially, J–M had the capacity to produce 300,000,000 pounds of PVC pipe each year. Formosa supplied J–M with most of its resin requirements.

According to Heath, at the time J–M entered the market the PVC pipe market was highly competitive. The market had numerous pipe producers and had an overabundance of resin selling at low prices. He testified that Formosa could not sell all the resin it produced.

In 1984, Robert Chou called Heath and asked him to purchase more resin from Formosa. According to Heath, Chou wanted Heath to run his plant at full capacity and to expand his business. Heath testified that he agreed to purchase more resin if Formosa would extend H & W's credit terms. Heath said Chou agreed to this, and H & W began to purchase 4,000,000 to 8,000,000 pounds of resin each month from Formosa.

In the summer of 1985, Robert Chou asked Heath to come to New Jersey to meet with Y.C. Wang. Heath and Wayne Hamilton, H & W's vice-president, went to Florham Park, New Jersey on August 22, 1985. According to Heath and Hamilton, Wang wanted H & W to purchase all of its resin supplies from Formosa and wanted H & W to run its plants at optimum capacity. Hamilton and Heath testified that Heath agreed to purchase 80% of the resin requirements for the Booneville and Springfield plants. In return, Heath said Wang agreed to sell resin at a competitive price and promised not to curtail H & W's resin supplies during a time of shortage. After returning to Booneville, Hamilton wrote a letter to Bob Chou setting forth his understanding of the parties' agreement. The letter indicated that Formosa would supply 80% of H & W's resin needs and Formosa would charge H & W the same price Formosa's competitors charged for resin. (Plaintiff's Exhibit 1.) Hamilton testified that after the August meeting he believed

Formosa and H & W had entered a long-term contract which could only be terminated by a mutual agreement.

Between September, 1985 and March, 1986, H & W purchased between 88% and 174% of H & W's resin requirements from Formosa. (Plaintiff's Exhibit 37.) According to Heath and Hamilton, H & W accommodated Formosa by purchasing more resin than the Springfield and Booneville plants needed. In March, 1986, Heath refused to purchase resin from Formosa because their price was too high. (Plaintiff's Exhibit 4.)

On April 1, 1986, H & W began to operate the Hunter PVC pipe plant in Lincoln, Alabama and started shipping resin there in June. In November, 1986, Hamilton formed Southern Louisiana Plastics and leased a PVC plant in Slidell, Louisiana. H & W began shipping resin there too.

According to Heath, in the fall of 1986, there was less resin available in the U.S. market. In December, 1986, Formosa began to cut H & W's resin supply. Heath said he continually asked Formosa for 11,000,000 pounds per month and tried to purchase resin from other suppliers, but the market was tight and prices were high.

In early 1987, J–M purchased PVC pipe manufacturing plants in Horton, Texas and Fontana, California. While J–M was expanding, Formosa increased its supply of resin to J–M and decreased its supply to H & W. In February, 1987, Formosa began charging H & W more for resin than it charged J–M. (Plaintiff's Exhibit 56.)

On February 1, 1987, H & W owed Formosa $13,700,000 for resin of which $6,600,000 was overdue. On February 10, 1987, Gordon Miller, Formosa's new assistant credit manager, wrote Heath and asked that H & W pay its overdue account to get it within 90–day payment terms. (Plaintiff's Exhibit 7.)

In early February, Robert Chou told H & W that Formosa would reduce H & W's resin shipments. Hamilton sent a mailgram objecting to the reduction and demanding more resin. (Plaintiff's Exhibit 9.) Ben Chein, Formosa's coordination manager, wrote Hamilton asking that H & W get its account in order. Chein explained that Formosa was concerned about releasing a resin shipment when H & W's account was $4,784,382.61 overdue. (Plaintiff's Exhibit 8.) On March 2, Ben Chein wrote Hamilton that Formosa would send only four rail cars. He told Hamilton that Formosa would not fill H & W's entire order because of a price disagreement and because H & W owed $5,178,280.38 which was past due. Chein warned Hamilton that if H & W failed to pay, Formosa would stop making any shipments. (Plaintiff's Exhibit 11).

The same day, Hamilton responded to Chein's February 24 letter. In his letter, Hamilton disagreed with the amount H & W owed and demanded that Formosa ship twenty-one rail cars to make a 10,000,000 pound per month quota he claimed Formosa agreed to. (Plaintiff's Exhibit 10.)

On March 3, Hamilton and Heath met with Ben Chein, Bob Chou and Gordon Miller to arrange a payment schedule for H & W. At the meeting H & W agreed to accept 4,500,000 pounds of resin per month until June and promised to pay Formosa to get its account within 90–day payment terms. During the meeting, Heath invited Miller to Booneville to examine H & W's records. (Plaintiff's Exhibits 12 & 14.)

Miller went to Booneville on March 10 and examined H & W's inventory and accounts receivable. Miller testified that he asked Heath for an audited financial statement. Miller said Heath told him H & W did not have an audited statement but claimed H & W was worth between $22,000,000.00 and $27,000,000.00. A financial statement introduced into evidence indicated that H & W was worth $5,159,901.05 in March, 1987. (Defendant's Exhibit 1A.)

On June 3, 1987, Ben Chein wrote Heath in reply to an order for 8,000,000 pounds of resin. Chein told Heath he could only ship 6,800,000 pounds in June because of production problems. (Plaintiff's Exhibits 15 & 17.) On June 30, 1987, Chein wrote Heath explaining that he could only ship 6,000,000 pounds of resin in July due to Formosa's production problems. (Plain-

tiff's Exhibit 19.) Heath objected to these reductions. (Plaintiff's Exhibit 18.)

On August 25, Occidental Chemical Corporation sent J–M notice of cancellation of "a resin supply contract" with J–M. (Defendant's Exhibit 915.) On August 21, Formosa sent H & W notice of cancellation of the resin supply contract and told Heath that Formosa wanted to operate under a new contract with H & W. (Plaintiff's Exhibits 20 & 22.) On December 16, 1987, Formosa sent Heath the new contract in which Formosa agreed to supply H & W 4,500,000 pounds of resin each month. Formosa asked Heath to sign the contract and return it by December 31, 1987. (Plaintiff's Exhibit 27.)

Instead of signing the new contract, H & W sought relief from this court by way of a temporary restraining order. On December 31, 1987, this court entered an ex parte temporary restraining order on the representation of counsel that Formosa had a contractual obligation to supply 11,000,000 pounds of resin to H & W each month. H & W asks the court to keep that order in effect by way of a preliminary injunction and asserts that H & W also is entitled to an injunction because Formosa's resin reduction would enable J–M to succeed in monopolizing the PVC pipe market, contrary to federal law.

## II.

To secure a preliminary injunction, H & W must show:

    (1) a substantial likelihood of success on the merits;

    (2) a substantial threat of irreparable injury if an injunction is not issued;

    (3) the threatened injury to H & W outweighs the damage the injunction might cause Formosa; and

    (4) the injunction will not disserve the public interest.

*Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974). H & W asserts six causes of action against Formosa, namely: breach of contract; fraud; misappropriation of trade secrets; defamation; wrongful interference with business relations; and antitrust violations.

Initially, the court will ascertain whether H & W has a breach of contract claim against Formosa.

■ At trial and in its briefs, H & W claims the parties agreed to a new contract on August 22, 1985. Heath and Hamilton testified that Wang agreed to supply H & W with 11,000,000 pounds of resin each month at the same price Formosa's competition charged and that Formosa would not terminate the contract during a resin shortage. H & W points to the letter Hamilton sent Formosa as a confirmation of the contract. *See* Miss.Code Ann. § 75–2–201(2) (1972). Formosa argued that their 1983 contract with Formosa limited its modification to an agreement signed by both parties. Formosa pointed out that the letter was not signed by Formosa; thus, it is not enforceable. *See* Miss.Code Ann. § 75–2–209(2) (1972).

A party may waive a provision in a contract limiting modification to a signed writing through a persistent pattern of conduct which ignores the limiting provisions. Miss.Code Ann. § 75–2–209(4) (1972); *Corenswet, Inc. v. Amana Refrigerator, Inc.*, 594 F.2d 129, 136 (5th Cir.1979); *City of Mound Bayou v. Ray Collins Constr. Co.*, 499 So.2d 1354, 1359–60 (Miss.1986). By supplying H & W with more than 4,000,000 pounds of resin each month as agreed to in the 1983 contract, Formosa waived the provision limiting modification. Even so, the agreement H & W claims Formosa made in August, 1985, must meet the requirements of the statute of frauds. Miss.Code Ann. § 75–2–209(3) (1972).

■ H & W argues that Hamilton's letter to Formosa confirmed the terms of H & W's agreement with Formosa, thus meeting the requirements of Miss.Code Ann. § 75–2–201(2) (1972).

This statute, however, does not provide an exception to Mississippi's general statute of frauds, Miss.Code Ann. § 15–3–1 (1972), rather it compliments it. The Uniform Commercial Code provision, § 75–2–201(2) allows merchants to enter oral contracts for over $500.00 by sending a confirmation letter. Unless the letter is

signed by the party to be charged, it must be performed within fifteen months or it falls within Mississippi's general statute of frauds. *See Roberts v. Southern Wood Piedmont Co.,* 571 F.2d 276, 278 (5th Cir. 1978) (applying the general statute of frauds to an oral output agreement).

Both Heath and Hamilton testified that Formosa and H & W made a permanent agreement in August, 1985, which they expected to last several years. As such the oral agreement falls within the general statute of frauds. *Roberts v. Southern Wood Piedmont Co,* 571 F.2d at 278 (5th Cir.1978); *Stahlman v. National Lead Co.* 318 F.2d 388, 395 (5th Cir.1963). Neither past performance nor a claim of equitable estoppel can avoid the defense of the statute of frauds. *Ivey's Plumbing & Elec. v. Petrochem Maintenance, Inc.,* 463 F.Supp. 543, 552–554 (N.D.Miss.1978); *Affiliated Investments, Inc. v. Turner,* 337 So.2d 1263, 1268 (Miss.1976).

■ Even if the court could ignore the statute of frauds and accepted Hamilton's letter as a contract, H & W is not entitled to specific performance by way of a preliminary injunction. Hamilton's letter did not provide a termination date. Hamilton and Heath claimed that Formosa orally agreed to a long-term contract which could not be terminated during a resin shortage.

A contract for an indefinite period cannot be perpetual but may be terminated at any time after giving reasonable notice. Miss. Code Ann. § 75–2–309 (1972); *King v. Exxon Co. USA,* 618 F.2d 1111, 1118–1119 (5th Cir.1980); *Bel–Mar Ford Tractor v. Woods & Copeland Mfg.,* 602 F.2d 1199, 1200 (5th Cir.1979). Formosa sent H & W notice of cancellation on August 31, 1987, four months before it cancelled the contract. Consequently, Formosa effectively terminated its supply contract with H & W.

H & W is not entitled to a judgment on its contract claim as a matter of law. As a result, the claim will be dismissed and cannot serve as a basis for a preliminary injunction. The only remaining claim which gives rise to the possibility for injunctive relief is H & W's claim that Formosa violated section 2 of the Sherman Antitrust Act.

*See Walker v. U–Haul Co. of Mississippi,* 734 F.2d 1068 (5th Cir.1984).

### III.

■ H & W claims that Formosa and J–M tried to monopolize the PVC pipe market and that Formosa is likely to achieve that end. *See Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 275 (5th Cir.1978), *cert. denied.,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

H & W argued that the court should look solely to the area of the country in which H & W sold its pipe and determine whether Formosa seeks to control that market. Heath testified that in 1986 J–M controlled between 30% and 50% of the market in the Southeastern United States where H & W sold pipe. He claimed Formosa secured a 40% to 70% market share by 1987. Heath based his figures on a general feeling he got from talking to sales people in the PVC business.

Even if the court accepts H & W's definition of the relevant market, the plaintiff's own document shows that J–M controlled only 19% of the PVC market in the Southeast and 17.5% in the United States. (Plaintiff's Exhibit 47.) In order to show specific intent to monopolize, H & W must show J–M has the ability to do so. *Dimmitt Agri Industries, Inc. v. CPC Int'l, Inc.,* 679 F.2d 516, 533 (5th Cir.1982). A low market share may make attempted monopolization an impossibility as a matter of law. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 490 (5th Cir. 1984). "... [A]bsent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization." *Id.* at 489.

H & W claims the shortage of resin gives Formosa and J–M the ability to control the PVC pipe market. H & W did not show what part of the resin market Formosa controlled. The only proof of this was the testimony of the defendant's expert, Dr. Paul Oliver. He testified that Formosa has 11.6% of the resin market in the United States. Consequently, neither Formosa nor J–M has the ability to control either the

resin or the PVC market. This is evidenced by Formosa's attempt and failure to raise the resin prices in March, 1986.

H & W failed to show the degree to which the resin shortage was a barrier of entry into the PVC pipe producing industry. The only evidence before the court was Heath's testimony that resin supplies were growing short and resin prices were rising. Heath admitted he had been offered resin at higher prices than he paid Formosa, but he declined to purchase the resin. He complained that by limiting the amount he could purchase, Formosa made J–M more competitive than H & W.

■ As the market price for resin rose, Formosa charged J–M less for it and supplied J–M with all the resin it needed. When Formosa did this, J–M became competitive and began showing a profit in 1987. It made economic sense for Formosa to favor its wholly owned subsidiary. As a matter of law, a parent corporation may favor its subsidiary so long as it does not lead to control of the relevant market. *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 704 F.2d 787, 795 (5th Cir.1983). The proof showed that J–M would probably have 22% of the PVC market in the Southeastern United States in 1988. This share is not enough to give J–M control of the PVC pipe market.

H & W's antitrust claim relies on Heath's unsupported conclusions about the PVC industry and the resin market. Such evidence is insufficient to establish the essential elements of an antitrust suit. *See J. T. Gibbons*, 704 F.2d at 793. As a result, this claim will be dismissed.

An order in accordance with this memorandum opinion will issue.

## AMENDED ORDER

In accordance with the memorandum opinion issued this day, it is hereby ORDERED that:

(1) the plaintiff's motion for a preliminary injunction is DENIED;

(2) Count I of the plaintiff's complaint for breach of contract is dismissed; and

(3) Count VI of the plaintiff's complaint for violation of section 2 of the Sherman Antitrust Act is dismissed.

THIS, the 22nd day of February, 1988.

## ON MOTION TO RECONSIDER

The court has before it the motion of H & W Industries, Inc. ("H & W") to vacate, to reconsider or, in the alternative, for immediate appeal of the dismissal of Counts I and VI of H & W's complaint. Having read the parties' memoranda, examined the evidence presented and being advised of the premises, the court is in a position to rule on the merits.

H & W argues that Counts I and VI of its complaint were improperly dismissed after the court heard evidence on H & W's motion for a preliminary injunction. H & W wishes to depose two additional witnesses to prove these claims but did not indicate how the testimony of these witnesses could alter the disposition of these claims. Because H & W had the opportunity to establish these claims through expedited discovery and a four-day hearing on the merits, the court finds H & W's motion to vacate without merit. *See Atlantic Richfield Co. v. F.T.C.*, 546 F.2d 646, 651 (5th Cir.1977); *Willits v. Richardson*, 497 F.2d 240, 244 (5th Cir.1974).

H & W also asks the court to reconsider the dismissal of Counts I and VI by asserting the same arguments which the court has already considered. H & W makes one point which merits further comment. H & W claims that equitable estoppel bars assertion of the statute of frauds and therefore the court improperly applied the statute to H & W's contract claim. The statute of frauds was enacted to prevent litigants from fabricating contractual agreements whose validity cannot be tested. Proof of equitable estoppel avoids the statute of frauds because a party's detrimental reliance gives credence to the assertion that a promise was made. *See PMZ Oil Co. v. Lucroy*, 449 So.2d 201 (Miss.1984). Accordingly, H & W's contract claim was dismissed, but Count II in which H & W

pled facts which give rise to a claim for equitable estoppel was retained.

H & W's remaining arguments made in support of the motion to reconsider have previously been considered and do not alter the court's opinion of the merits of Counts I and VI. Accordingly, H & W's motion to reconsider will be denied.

The adjudication of Counts I and VI has been completed. Since H & W may appeal the denial of injunctive relief it sought in Counts I and VI pursuant to 28 U.S.C. section 1292(a)(1) and is in fact doing so, the court finds that H & W should be allowed also to appeal these issues along with the denial of the injunction and this procedure would not constitute an appeal that would not otherwise exist. Therefore, the court will enter a final judgment as to these claims pursuant to Fed.R.Civ.P. 54(b).

An order in accordance with this memorandum opinion will issue.

### ORDER

In accordance with the memorandum opinion issued this day, it is hereby ORDERED that:

(1) the plaintiff's motion to vacate the dismissal of Counts I and VI is DENIED;

(2) the plaintiff's motion for reconsideration of the court's order and memorandum opinion issued on February 22, 1988 is DENIED; and

(3) the court hereby directs the entry of final judgment as to Counts I and VI of the plaintiff's complaint for purposes of appeal.