**HENDERSON BROADCASTING COR- PORATION, More Commonly Known as KYST–AM, Plaintiff,**

**v.**

**HOUSTON SPORTS ASSOCIATION, INC. and Lake Huron Broadcasting Corporation, Owner of KENR–AM Radio, Defendants.**

**C.A. No. H–81–558.**

United States District Court, S.D. Texas, Houston Division.

July 24, 1986.

See also 541 F.Supp. 263.

Charles J. Brink, Houston, Tex., for plaintiff.

Mark E. Lowes, Bracewell & Patterson, Houston, Tex., for Houston Sports Assn.

Robert Dabney, Dabney, Kelly, Sheller & Wells, Houston, Tex., for Lake Huron Broadcasting Co.

## ORDER

McDONALD, District Judge.

Pending before the Court is Defendants' Motion for Partial Summary Judgment. Having carefully considered the pleadings and applicable law, the Court concludes that the Motion should be GRANTED in Part and DENIED in Part.

1. KYST, a radio station which was owned by Plaintiff Henderson Broadcast-ing Corporation, was licensed by the FCC on June 11, 1980, and broadcasted at 920 on the AM frequency. As part of its regular business, KYST sold broadcast time to businesses on the local, regional, and national level. Such advertisements were played throughout the broadcast day. Defendant Houston Sports Association, Inc. ("HSA") is the owner of the Houston Astros, a major league baseball team. Lake Huron Broadcasting Corporation ("KENR") is the owner of a local Houston AM radio station, KENR (KENR now goes by the call letters of KRBE).

2. The primary source of income for KYST Radio, as with most other AM and FM radio stations, was the sale of advertising time. The rates for such advertisements, or "radio spots" as they are known in the trade, are dependent largely upon the size of the listening audience for a particular radio station. The larger the audience the higher the rates which can be charged and the greater the income the radio station can earn. The larger the number of listeners a station attracts translates into more money an advertiser will pay to have his product or service advertised on a particular station, because his message can reach more potential customers.

3. The size of a station's audience is measured by the "ratings." The ratings are formulated by the Arbitron Survey. If a station's ratings are high, this indicates a large audience and the station can charge more for its advertising spots. The opposite is also true, that is, if a station's ratings go down or are low, then the rates it can charge must also be lower. The fact that a station's ratings are high or low affects directly the number of potential advertisers. The higher the ratings the greater the potential number of advertisers and, likewise, the lower the ratings the lower the number of potential advertisers. Both the number of advertisers and the rates or prices charged for advertising time are critical to a station's success or failure.

4. The parties to this action were in the business of selling advertising to various concerns at the time this lawsuit was filed. Part of their business involved contracting and dealing with other companies outside the State of Texas. Based upon the above, the activities of the parties were conducted in interstate commerce.

5. To increase fan interest in the team, the Astros, like other major league baseball teams, contracted with radio and television stations to broadcast Astros' games both home and away to fans unable to attend the games. Those contracts are called station contracts.

6. One purpose for the broadcasts is to raise revenue directly for the Astros by sales of advertising time on the broadcasts. Under the station contract, the Astros control all advertising except for a selected number of spots, for instance six (6) ninety-second (90) spots, which they allow for the station broadcasting the games to use.

7. In the instant case, Defendant Houston Sports Association entered into station contracts with both Plaintiff KYST and Defendant KENR. The broadcast signals of these two stations overlapped in the Houston-Galveston area. Both KYST and KENR competed for advertising revenue from the Houston-Galveston market. Thus, they were competitors for listeners and advertising dollars.

8. On or about February 24, 1981, KYST's station contract with HSA was terminated. The uncontroverted events which preceded the termination were 1) KYST sent a letter, dated October 17, 1980, to HSA expressing its willingness to carry the Astros baseball game broadcasts in the Galveston area with some minimal daytime overlap of its broadcast in Houston; 2) HSA sent a cover letter and two copies of the station contract to KYST and the contract noted its duration from January 1, 1981, to December 31, 1981, without mention of the particular geographic area; 3) the cover letter, dated December 1, 1980, required KYST to sign and return the station contract to HSA.

9. On May 12, 1981, KENR and HSA executed a three year contract for KENR to become the Astros' flagship station in Houston. The flagship station originates the broadcasts of the Astro's games and distributes them to the network. The flagship station also promotes and broadcasts in the key hometown market—Houston. KENR was granted the three year exclusive flagship rights to broadcast the Astros' games in Houston.

10. The facts are uncontroverted, that KYST and KENR competed for advertising revenue and listeners. They also competed with all other radio stations in the Houston-Galveston area for advertising revenue and listeners.

11. At the time this lawsuit was filed there were over forty radio stations in the Houston-Galveston area. All the radio stations competed through broadcast programming, promotions, and other product differentiation. The goal of programing is to develop a unique format which attracts an audience and with them advertisers. The overall radio advertising market was highly competitive.

12. HSA controlled 100% of the broadcast and advertising of all Astros' games.

KYST filed its complaint against HSA and KENR for 1) unlawful combination and conspiracy in unreasonable restraint of interstate trade in violation of Section One of the Sherman Act; 2) unlawful monopolization, attempted monopolization, and conspiracy to monopolize in violation of Section Two of the Sherman Act; 3) violation of the Texas Business and Commerce Code; 4) breach of contract against HSA, solely; and 5) tortious inference with business interest against KENR, solely.

On the other hand, HSA and KENR move for Partial Summary Judgment on the basis that 1) the rule of reason governs the case; 2) HSA's territorial restraints are not unreasonable restraints of trade; 3) HSA's termination of KYST did not injure competition; 4) HSA and KENR have insufficient market power to monopolize the relevant market; and 5) KENR did not

tortiously interfere with KYST's business relations.

While "[s]ummary judgment is an excellent device by which district courts may make expedited disposition of those cases in which a trial would be fruitless," *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir.1980), the district court may grant it "only when the moving party has established his right to judgment with clarity that the nonmoving party cannot recover . . . under any discernable circumstance." *Everhart v. Drake Management, Inc.*, 627 F.2d 686, 690 (5th Cir.1980). The district court, when deciding whether to grant a motion for summary judgment, must view the evidence in the light most favorable to the party resisting the motion. *Joplin v. Bias*, 631 F.2d 1235, 1237 (5th Cir.1980). Pursuant to Fed.R.Civ.P. 56, summary judgment may be granted only where the entire record, *i.e.*, pleadings, depositions, interrogatories, etc., shows that no genuine issue of material fact exists. *Erco Industries, Ltd. v. Seaboard Coast Line Roalroad Co.*, 644 F.2d 424, 428 (5th Cir.1981). The mover must bear the burden of proof, and "all reasonable doubts as to the existence of the genuine issue of material fact" have to be resolved against him. *Id.* The fact that it appears that the nonmover is unlikely to prevail at trial or that the mover's facts appear more plausible are not reasons to grant summary judgment. *Hayden v. First National Bank*, 595 F.2d 994, 997 (5th Cir.1979). The trial court has no duty to decide factual issues, only whether there is an issue of fact to be tried. *Foster v. Swift & Co.*, 615 F.2d 701, 702 (5th Cir.1980). *Jones v. Western Geophysical Co.*, 669 F.2d 280 (5th Cir.1982).

*Section One*

In a capsule, Plaintiff claims that HSA and KENR conspired to restrict the broadcast of Houston Astros baseball games by eliminating KYST from the market of selling advertising time during Houston Astros baseball game broadcasts. At the outset, Plaintiff contends that the Defendants' conduct was a *per se* violation of Section One of the Sherman Act. 15 U.S.C. § 1 (1982). The elements of a Section One violation are 1) a conspiracy exists between two or more competitors; 2) the conduct of the conspirators amounts to an unreasonable restraint of trade or competition; 3) the conspiracy was entered into to effect an illegal objective (e.g. price fixing); and 4) the Plaintiff must suffer injury as a result of the acts of the conspirators.

A *per se* violation of the antitrust laws occurs where the effect or the natural tendency of the competitor's conduct is so pernicious that it is lacking in any redeeming value. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 47, 97 S.Ct. 2549, 2556, 53 L.Ed.2d 568 (1976); *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). In the present case, the owner of a baseball team and one of its advertising stations is accused of conspiracy to remove Plaintiff from the market of broadcasting Astros Baseball Games for advertising revenues. The alleged conduct relates to "non-price" restrictions on intrabrand competition.[1] The main dispute between the parties concerns the Defendants reluctance to have KYST and KENR share broadcasting markets and does not concern pricing practices as discussed in *GTE Sylvania*. *GTE Sylvania*, 433 U.S. at 47, 97 S.Ct. at 2556. From the facts alleged in the complaint and adduced from the summary judgment evidence, the Court finds this owner-broadcasting station case is analagous to a manufacturer-distributor case. Both cases involve a vertical arrangement

---

1. *Per se* unlawful conduct is generally associated with pricing practices, such as price fixing. For example, price fixing by competitors is one of the practices which the courts have deemed to be unlawful with or without any explanation or justification for the practice. *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1957). However, the courts are reluctant to find "non-price" restrictions *per se* unlawful because of the redeeming effects of certain non-price conduct. *GTE Sylvania*, 433 U.S. at 51, n. 18, 97 S.Ct. at 2558, n. 18.

between the owner-manufacturer and the broadcaster-distributor. In manufacturer-distributor cases a manufacturer generally has a right to deal or refuse to deal with whoever it wishes, as long as it does so independently. *Monsanto Company v. Spray-Rite Service Corporation*, 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *United States v. Colgate & Company*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). Manufacturer-distributor cases which involve non-price restrictions are not subject to *per se* analysis and are judged under a "rule of reason" analysis. *Rule of Reason*

Under a rule of reason analysis the Court must weight the relevant circumstances surrounding the restrictive practice to determine whether the practice has any redeeming effects in the market and to determine whether the practice is an unreasonable restraint on competition within the relevant geographic and product markets.

Both parties agree that the relevant geographic market is the Houston-Galveston area. With regard to the product market, neither party can dispute that a broad market exists for the sale of all advertising spots to the general business community on all radio formats. The relevant product market is the market of competing uses for the particular product in issue. In the case before the Court, the relevant product market will consist of advertising spots created by radio broadcast formats that compete with the advertising spots created by the broadcast of the Astros' baseball games. In determining the competing uses, the Court must examine the functional and reasonable interchangeability between advertising during Astros' broadcast and other competing advertising spots. *United States v. E.I. DuPont de Nemours & Company*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). In the broad market of all radio broadcast formats, the Defendants' allege that concerted action would not have a significant anticompetitive effect on the market, because the elimination of one dealer from broadcasting advertising spots on a single format among the thousands of formats available would not amount to an unreasonable restraint on all competition. The antitrust laws protect the market; not the individual entrepreneur.

However, the Plaintiff alleges that a submarket exists for the sale of advertisements directed at professional baseball fans, during the broadcast of Astros' baseball games. Case law demonstrates that based upon the economic realities of a particular market various submarkets may exist which are separate economic arenas for the rule of reason analysis. *United States v. Grinnell Corporation, et al.*, 384 U.S. 563, 572, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1965); *Brown Shoe Company v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). Submarkets are determined upon the same analysis of functional and reasonable interchangeability of the particular product.

KYST contends that a single product (advertising spots during the Astros baseball format broadcast) is the relevant product market in this case. There is minimal support in the case law for finding that a "single-product" within an existing market is the relevant product submarket. The Supreme Court discussed the possibility in *E.I. DuPont*, but the Court did not find that DuPont's cellaphane paper was a single-product product market. *United States v. E.I. DuPont de Nemours & Company*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956). The Court of Appeals for the Fifth Circuit also discussed the possibility in *J.T. Gibbons*. *J.T. Gibbons, Inc. v. Crawford Fitting Company, et al.*, 704 F.2d 787, 795–96 (5th Cir.1983). The Court in *J.T. Gibbons* noted that the product must be so unique or so dominant in the market in which it competes that any action by the manufacturer to increase its control over the product virtually assures that competition in the market will be destroyed. *J.T. Gibbons*, 704 F.2d at 796, *citing Bushie v. Stenocord Corporation*, 460 F.2d 116, 121 (9th Cir.1972). Again the Fifth Circuit did not find a single-product product market in that case.

■ Plaintiff argues that the broadcast of Astros home baseball games is so unique that there are no reasonably interchangeable formats which compete with it in the relevant geographic market. A determination of the reasonable and functional interchangeability of a product or service requires the examination of expert testimony as to possible relevant product markets. The Defendants' summary judgment evidence regarding expert opinions on the relevant product market shows that the smallest product market existing for radio broadcasts is all radio formats. *See* Deposition of Roger Noll, pp. 70–77; Deposition of Howard Kitt, pp. 11–20, 23–27, 30–38. At the very least, the Defendants' experts establish that all radio stations compete by using varying broadcast formats to draw advertisers. Plaintiff contends that Houston Astros baseball hometown broadcasts are so unique that there is no reasonably interchangeable use or product. The Court finds that it is a legal impossibility for the Astros baseball broadcasts to be a relevant product market in a geographic area where there are competing uses. While there is case law that supports the uniqueness of baseball as·a sport, there is no case law which supports the finding that the broadcast of a single baseball team commands the same analysis. Moreover, the product which is in dispute is the ability of a radio station to reach a particular audience. The Supreme Court in *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma* held that intercollegiate football telecasts constituted a separate product market, but the Court did not go so far as to say that the telecast of the Oklahoma Sooners was a separate product market, despite the Sooners uniqueness and dominance in the market for collegiate sports telecasts. *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)[2] In weighing the economic realities of various product uses, the Court of Appeals for the Fifth Circuit has consistently rejected the use of a single-product product market. *See Hornsby Oil Company v. Champion Spark Plug Co.,* 714 F.2d 1384 (5th Cir.1983) (where the product market was defined as spark plugs rather than Champion spark plugs); *Parsons v. Ford Motor Co.,* 669 F.2d 308 (5th Cir.1982) (where the product market was defined as automobiles instead of Ford automobiles); *Muenster Butane, Inc. v. Steward Co.,* 651 F.2d 292 (5th Cir.1981) (where the product market was defined as TV sets rather than only Zenith TV sets).

Defendants contend that the relevant product market is the advertising spots on all radio formats which attract audiences. The determination of the relevant product market is an important factual question in this lawsuit. While Defendants contend that the Plaintiff would be unable to prove that Defendants possess sufficient market power within the product market for all radio broadcasts as a matter of law, the fact remains that market power is relative. While it might be assumed that Defendants possess a minimal market share in the market the Court cannot find insufficient market power, because the summary judgment evidence does not pinpoint Defendants' market share (complete market power) of the radio broadcasts in the Houston-Galveston area. While an expert may give an ultimate opinion about an issue of fact in the case, that opinion must be supported by an adequate basis. The Court is unable to find that basis within the evidence on file. An expert witness' conclusions without sufficient factual basis is not enough to support a motion for summary judgment as a matter of law. The Court concludes that without evidence of the market shares of the Defendants in the relevant market a determination of market power is impossible under either Section One or Section Two analysis.[3]

---

**2.** The Court also takes judicial notice of the dominance of the Oklahoma Sooners over all other collegiate football teams on the field as well as on the television telecast.

**3.** Both Section One and Section Two of the Sherman Act require the Plaintiff to establish an adverse impact upon competition in the relevant product and geographic markets.

*Section Two*

A Section Two allegation also requires a determination of the relevant product market. The elements of a Section Two claim are 1) that HSA and/or KENR monopolized or attempted to monopolize the product or service in the relevant geographic and product markets; 2) that either Defendant exercised its power in restraint of trade or competition; 3) that either Defendant had a specific intent to cause an illegal result; and, with respect to attempted monopolization, 4) that a dangerous probability existed for them to carry out their monopoly if left alone.

Similar to the Section One analysis, all of the elements which comprise a Section Two claim are inextricable intertwined with the determination of the relevant product market. For the same reasons set forth in the Court's Section One analysis, the Court concludes that summary judgment must be denied with regard to Defendants' alleged violations of Section Two of the Sherman Act.

*State Antitrust Claims*

Plaintiff's state antitrust claims arise out of the Texas Free Enterprises and Antitrust Act of 1983, Tex. Bus. & Comm. Code Ann. §§ 15.01 *et. seq.* The relevant sections, Section 15.05(a) and (b), mirror the language of Sections One and Two of the Sherman Act. The Texas legislature expressly intended that the Texas antitrust sections be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with promoting the State's economic competition. Tex. Bus. & Comm. Code Ann. §§ 15.01 *et. seq.* As a result, the analysis under Sections One and Two of the Sherman Act applies equally to the Plaintiff's state antitrust claims. The Court concludes that summary judgment must be denied on the state antitrust claims.

*Tortious Interference*

KENR moves for partial summary judgment on KYST's claim for tortious interference with business relationships. KENR contends that KYST was terminated by HSA and that KENR had no role in KYST's termination.

The elements of a tortious interference claim are that 1) a contract exists which is subject to interference; 2) the Defendant committed an intentional act of interfering with the contract; 3) the Defendant's conduct was a proximate cause of the Plaintiff's damages; 4) the Plaintiff suffered actual damage or loss; and 5) the Defendant interfered without right or justification. *Ashcroft v. W.T. Bradshaw and Co.*, 601 S.W.2d 809, 811 (Tex.Civ.App.1980); *White v. Larson*, 586 S.W.2d 212, 215 (Tex.Civ. App.1979).

KENR argues that KYST has failed to present proof that KENR "willfully, intentionally or in anywise interfered with KYST's contract or business relationship with HSA resulting in damages to KYST." (KENR's Brief in Support of Motion for Summary Judgment, p. 36).

The standard for determining whether KENR is entitled to summary judgment is that KENR must demonstrate no material issues of fact are in dispute and a right to summary judgment as a matter of law. KENR asserts that KYST failed to rebutt HSA's explanation for the termination of the KYST contract with any evidence. However, the existence of disputed issues of material fact is sufficient to deny summary relief. At this point in the case, KYST does not have the burden of showing by a preponderence of the evidence that KENR caused the termination. The Court finds that enough evidence exists in the record to place the above factual issues in dispute. For the above reasons the Court denies KENR's Motion for Partial Summary Judgment.

After careful consideration of the issues presented in the Defendants' Motion for Summary Judgment, the Court concludes that the Motion should be DENIED. Accordingly,

It is ORDERED, ADJUDGED, and DECREED that Defendants' Motion for Partial Summary Judgment is hereby Granted

in Part as to the Plaintiff's claims for *Per Se* Violation.

It is further ORDERED, ADJUDGED, and DECREED that Defendants' Motion for Partial Summary Judgment is hereby DENIED in Part as to all other claims for relief.

The Clerk shall file this Order and provide a true copy to counsel for all parties.