The TIMES HERALD PRINTING
COMPANY, Appellant,

v.

A.H. BELO CORPORATION,
et al., Appellees.

No. A14–90–00856–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 27, 1991.

Roger D. Townsend, Wayne Fisher, Houston, for appellant.

Harry M. Reasoner, Houston, William D. Sims, Jr., Dallas, John L. Hill, Jr., W. James Kronzer, Houston, for appellees.

Before MURPHY, CANNON and ELLIS, JJ.

## OPINION

CANNON, Justice.

The principal question posed by this appeal is whether anticompetitive conduct of a defendant who attempts to achieve monopoly power in a relevant market may be redeemed by a legitimate business purpose. When that conduct involves a nonprice vertical restraint, the answer is no. Rather, the proper approach is to apply a "rule of reason" standard, allowing the trier of facts to weigh all of the evidence to determine whether the legitimate business justifications of a defendant's conduct outweigh its threat to competition or whether the conduct unreasonably restrained trade. In the present case, the jury was incorrectly instructed that to violate antitrust laws the defendants' conduct must have *no* legitimate business purpose. However, we hold the error to be harmless because, in response to a separate question, in which the jury was properly instructed to employ a "rule of reason" analysis, the jury found that the defendants' conduct did not unreasonably restrain trade. We affirm.

Appellant, the Times Herald Printing Company, publisher of the Dallas Times Herald newspaper, sued its rival, the Dallas Morning News and its parent company, A.H. Belo Corporation, appellees, alleging tortious interference, civil conspiracy, and violations of the Texas Free Enterprise and Antitrust Act, TEX.BUS. & COM.CODE ANN. §§ 15.01–15.51 (Vernon 1987 & Supp.1991). The Times Herald accused the News of raiding its feature pages when the News entered into an exclusive five-year contract with Universal Press Syndicate (UPS), which had provided comics, columns and commentaries to the Times Herald for nearly twenty years. The Times Herald originally sued UPS as an additional defendant, but later non-suited it.

The trial court granted the News a directed verdict on claims of civil conspiracy and unfair competition, but submitted the remaining claims to the jury. By a 10–2 vote, the jury rendered a take-nothing verdict. In eight points of error, the Times Herald contends (1) the trial court incorrectly charged the jury on the law regarding exclusionary and restrictive conduct, (2) its cause of action for tortious interference with existing contracts should have been submitted to the jury, (3) the jury's negative answers regarding unreasonable restraint of trade and tortious interference with agreements or business relationships are against the great weight and preponderance of the evidence, and (4) the trial court erred in granting a directed verdict on the Times Herald's claim of civil conspiracy.

The largest independent syndicator of newspaper features in America, UPS represents the work of approximately 75 creators of comic strips, editorial cartoons, commentaries and columns. In 1989, UPS was selling some twenty-six of these features to

the Times Herald, among them the popular advice column "Dear Abby," Erma Bombeck's humor column, and comic strips such as "Doonesbury" and "The Far Side." In most instances, the contracts renewed automatically each month unless cancelled by either UPS or the Times Herald with thirty days' notice.

In a letter dated August 3, 1989, UPS suddenly cancelled all twenty-six features with the Times Herald after signing (1) a five-year, $1 million joint venture agreement to produce and distribute television programs and promotions featuring UPS creations, and (2) an exclusive agreement with the News giving the News publication rights to current UPS features and right of first refusal on all UPS features that might become available. The News quickly commissioned an advertising campaign targeting Times Herald readers by trumpeting the transfer of features to the News. The campaign was "put on hold" after the lawsuit was filed.

In several weeks of testimony, experts told the jury that features play a vital role in shaping the identity of a newspaper and instilling loyalty in readers: in particular, UPS features, with their contemporary, satirical edge, generally attract a "hip," upscale *thirtysomething* type of reader, and as such could be used as tools in a circulation war to reach an important demographic group. The Times Herald contends that the transfer caused it to not only lose "tens of thousands" of readers, but also made it difficult to attract new subscribers. The appellees characterized their joint venture with UPS as a "terrific business opportunity."

Experts also testified that a newspaper whose shares of circulation and advertising revenue fall below 40 percent will "run [a] substantial risk of failure," as the newspaper faces the danger of falling into an irreversible "downward spiral" as circulation and advertising losses feed each other's decline. In head-to-head competition with the Times Herald, the News dominated with approximately 60 percent of daily circulation and approximately 70 percent of advertising. An economics professor and provost of Stanford University explained that a newspaper with such a substantial share of the market possesses "monopoly power," and that its aggressive pursuit of a competitor's resources, while "perfectly normal in an ordinary context," would pose a threat to competition where substantial monopoly power exists.

■ In points of error one through four, the Times Herald complains that the trial court's definitions and instructions regarding exclusionary or restrictive conduct incorrectly stated the law, and that such errors were "reasonably calculated to cause and probably did cause rendition of an improper judgment in the case...." TEX. R.APP.P. 81(b)(1). The Times Herald contends that, under the court's charge, unless a defendant acts *solely* by a desire to prevent competition, it cannot violate antitrust safeguards. Judge Learned Hand rejected such an all-or-nothing test nearly half a century ago:

> Only in case we interpret "exclusion" as limited to manoeuvres [sic] not honestly industrial, but actuated *solely* by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not "exclusionary." So to limit it would in our judgment emasculate the [Antitrust] Act[.]"

*United States v. Aluminum Co. of America*, 148 F.2d 416, 431 (2d Cir.1945) (emphasis added). In Question No. 1, the jury was asked, "Did A.H. Belo Corporation or The Dallas Morning News Company willfully attempt to achieve monopoly power in a relevant market or markets?" Among the accompanying instructions was one that explained:

> An "attempt to achieve monopoly power" occurs when a party has a specific intent to achieve monopoly power in a relevant market or markets; it engages in exclusionary or restrictive conduct in furtherance of its specific intent; and there is a dangerous probability that it will achieve monopoly power in the relevant market.

The jury was further instructed:

> "Willfully" ... means to attempt to acquire, to acquire or to maintain monopoly

power by exclusionary or restrictive conduct, as distinguished from attempting to acquire, acquiring or maintaining monopoly power by having a superior product or by superior business skill, or as a result of historical accident.

Conduct is exclusionary or restrictive when its benefits depend on eliminating or crippling competition so as to enable the actor to reap the benefits of monopoly power in the aftermath. Exclusionary or restrictive conduct is conduct without legitimate business purpose that makes sense only because it eliminates or cripples competition.

First, we address the appellees' contention that any alleged error in the charge was waived, invited, and harmless. They assert that the Times Herald (1) failed to properly object to the alleged error, (2) invited error by offering the trial court a definition that was substantially the same, and (3) cannot demonstrate that a different verdict would have resulted from a different charge.

■ A party objecting to a charge must point out distinctly the error and grounds for the complaint. TEX.R.CIV.P. 274; *Castleberry v. Branscum*, 721 S.W.2d 270, 276 (Tex.1986). According to the appellees, the Times Herald failed to properly object when it merely challenged use of the word "only" in the second sentence of the definition of exclusionary or restrictive conduct as "more restrictive than the legal requirements for exclusionary or restrictive conduct." They reason that simply deleting the word "only" would, at best, leave only a "shade or phase" of the trial court's actual instructions, therefore there was no error. TEX.R.CIV.P. 278; *Prudential Ins. Co. v. Tate*, 162 Tex. 369, 347 S.W.2d 556, 559 (1961); *Versailles, Inc. v. Quadrant, Inc.*, 715 S.W.2d 161, 166 (Tex.App.—Houston [14th Dist.] 1986, no writ). However, by complaining of the "only" restriction, and by advocating that the proper instruction of exclusionary conduct is conduct that unnecessarily excludes or handicaps competitors, the Times Herald demonstrated to the judge that it objected to the heavy burden of disproving the possibility of any

business reason the appellees might have had other than to eliminate or cripple competition. This objection was consistent with the Times Herald's position throughout the case that even conduct having a legitimate business purpose can run afoul of antitrust laws. Further, in compliance with Rule 278 of the Texas Rules of Civil Procedure, which requires the party complaining of an omitted question, definition, or instruction to request a substantially correct alternative, the Times Herald tendered its Requested Jury Instruction No. 2:

"Exclusionary or restrictive" conduct is defined as unreasonable acts or practices that have the actual or reasonably foreseeable effect of substantially impairing competition in a relevant market in an unnecessarily restrictive way or of destroying competition. It is not necessary that such conduct be unlawful in and of itself, apart from its effect in achieving or maintaining monopoly power.

The instruction tendered by the Times Herald essentially applies the standard recommended by the American Bar Association in its *Sample Jury Instructions in Civil Antitrust Cases* C–20, C–96 (1987).

After several days of deliberating, the jury informed the trial court, "We are at a standstill with Question No. 1. How do we proceed?" In response, the court instructed the jury:

### ANSWER TO JURY QUESTION 1

If the *only* purpose of conduct is to eliminate or cripple competition, it is exclusionary or restrictive.

If conduct has *a* legitimate business purpose, it is *not* exclusionary or restrictive." (emphasis added.)

The Times Herald objected, and requested the following as a proper instruction: "Such conduct is without legitimate business purpose if it is used to acquire or maintain monopoly power by means other than fair competition." Alternatively, the Times Herald suggested language from a leading treatise on antitrust law: "Thus, 'exclusionary' comprehends at the most behavior that not only (1) tends to impair the

opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." 3 P. Areeda and D. Turner, *Antitrust Law* 626b at 78 (1978). The trial court overruled the Times Herald's objections and expressly refused its requested instructions. In effect, the trial court instructed the jury that antitrust liability arises only when a defendant engages in conduct from which absolutely no competitive purpose can be inferred. Although the appellees contend that the Times Herald's objections "hardly stood out against the background noise," we disagree. Certainly, the trial court was "fully cognizant" of the parties' conflicting contentions, and deliberately chose to charge the jury with the business justification defense. *Citizens State Bank v. Bowles*, 663 S.W.2d 845, 850 (Tex.App.—Houston [14th Dist.] 1983, writ dism'd).

■ Regarding the merits of the Times Herald's claims, appellees contend that governing antitrust principles allow a jury to decide only whether a defendant has *a* legitimate business justification for its conduct, not whether that reason is sufficient to outweigh its anticompetitive effects, thus the "effect of finding a legitimate business justification" is "preclusive." *See, e.g., Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1186 (5th Cir.1988) (citing *Mid–Texas Communications Systems, Inc. v. Am. Tel. & Tel. Co.*, 615 F.2d 1372, 1390 (5th Cir.1980)). The business justification defense allows a dominant firm to engage in conduct that is primarily motivated by an attempt to achieve or maintain a monopoly so long as its conduct has a legitimate business purpose. In support of this defense, appellees point to language in the ABA's sample jury instructions that reads: "If, however, defendant has a legitimate business reason for [its conduct], then you cannot find that its conduct was illegal." American Bar Ass'n, *Sample Jury Instructions in Civil Antitrust Cases* C–32 (1987). However, the "conduct" which these particular instructions address is a defendant's unilateral refusal to deal with a competitor. Likewise, many of the cases relied upon by appellees involve unilateral refusal-to-deal disputes, including the leading U.S. Supreme Court case, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

In *Aspen*, the question presented was whether a firm with monopoly power has a duty to cooperate with smaller rivals in a marketing arrangement. For several years, three independent skiing facilities in the destination ski resort of Aspen, Colorado offered a six-day, "all-Aspen" ticket allowing skiers to use each of the resort's four mountains for one price. After Ski Co. gained control over three of the four mountains, it stopped writing joint tickets with Highlands, which controlled the remaining mountain. Instructed to draw "a distinction 'between practices which tend to exclude or restrict competition on the one hand, and the success of a business which reflects only a superior product, a well-run business, or luck, on the other,'" the jury apparently concluded there were *no* valid business reasons for Ski Co. to terminate the all-Aspen ticket. Rather, Ski Co. "was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Id.* at 611, 105 S.Ct. at 2861.

■ Texas courts must construe state antitrust safeguards in harmony with federal judicial interpretations of comparable federal statutes. TEX.BUS. & COM.CODE ANN. § 15.04. Because contracts, combinations, and conspiracies in restraint of trade come in different forms, courts require different standards of proof and different safeguards to promote and protect competitive conditions. For example, certain *price fixing, group boycotts* and *tying agreements* are illegal *per se. Northern Pac. Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (conduct presumed illegal "without elaborate inquiry as to the precise harm they have caused or the business excuse for their use"). In cases of *predatory hiring*, unlawful conduct "can be proved by showing the hiring was made with such predatory intent, i.e. to harm the competition without helping the monopolist, or by showing a clear nonuse in

fact." *Universal Analytics, Inc. v. Mac-Neal–Scwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir.1990) (per curiam). In *Oahu Gas Serv., Inc. v. Pac. Resources, Inc.*, 838 F.2d 360 (9th Cir.1988), a *product innovation* case, a monopolist's desire to maintain market power did not create antitrust liability because it had *a* legitimate business justification in deciding not to market a new product. But to prevail on an action for illegal *vertical price fixing* (in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1973 & Supp.1991)), the U.S. Supreme Court has imposed a heightened burden of proof, requiring a plaintiff both to prove a conspiracy to fix prices and to disprove the possible existence of every potential business reason that might justify the manufacturer's conduct. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Most recently, the Texas Supreme Court adopted the following test for *predatory pricing:*

(1) the predatory pricing is economically feasible; and (2)(a) the price charged is below average variable cost; or (b)(i) there are substantial barriers to market entry; (ii) the seller is charging a price below its short-run profit-maximizing price and its average total cost; and (iii) the benefits of the seller's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power.

*Caller–Times Publishing Co. v. Triad Communications, Inc.*, 35 Tex.Sup.Ct.J. 114, 122 (Nov. 6, 1991).

 Although appellees contend that the business justification defense applies generally to monopoly cases, the *Aspen* court acknowledged that a manufacturer's "right to deal, or refuse to deal, with whomever it likes" is only protected "as long as it does so independently." *Aspen*, 472 U.S. at 601, 105 S.Ct. at 2856. In the present case, the Times Herald alleges not a *unilateral* refusal to deal but a *bilateral* agreement. Such an arrangement is characterized as "vertical" because UPS and the appellees are "at different levels of the market structure." *United States v. Topco Assoc., Inc.*, 405 U.S. 596, 608, 92 S.Ct.

1126, 1133, 31 L.Ed.2d 515 (1972). Because the agreement allegedly involves concerted action on nonprice restrictions, it must be judged under a "rule of reason" analysis to determine whether it constitutes an unreasonable restraint on competition. *Monsanto*, 465 U.S. at 761, 104 S.Ct. at 1469; *Henderson Broadcasting Corp. v. Houston Sports Ass'n, Inc.*, 647 F.Supp. 292, 296 (S.D.Tex.1986).

 Under the "rule of reason," the jury examines all of the circumstances of a case, weighing a defendant's legitimate business purposes against anticompetitive acts in order to determine which predominates. *Monsanto*, 465 U.S. at 761, 104 S.Ct. at 1469. In *Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918), the Supreme Court explained:

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

The appellees were accused of intending to cripple competition by contracting with UPS to deny the Times Herald access to an important resource. Taken to its logical extreme, the business justification defense might allow appellees to prevent the Times Herald from being printed at all by monopolizing other resources as well, so long as its contracts with suppliers made some business sense. The trial court endorsed such reasoning by instructing the jury that

*a* legitimate business purpose would redeem conduct that might otherwise be exclusionary or restrictive. Further, the trial court erred by rejecting the Times Herald's alternative instructions focusing on "unnecessarily restrictive" conduct. The "unnecessarily restrictive" standard contemplates the more common-sense "rule of reason" analysis allowing the jury to weigh all of the evidence to determine whether the business justifications of a defendant's conduct are sufficient to outweigh its threat to competition.

■■■■ Regardless of the improper charge on Questions No. 1 and 3, the jury ultimately applied a balancing test, or "rule of reason" analysis, when they answered "No" to Question No. 5, which asked:

> Did A.H. Belo Corporation or The Dallas Morning News Company enter into a contract or conspiracy with Universal Press Syndicate that willfully and unreasonably restrained trade in a relevant market or markets?

With respect to Question No. 5, the jury was instructed to consider "all the evidence in the case and the economic effects upon competition" in determining whether the agreement "unreasonably restrained trade" under antitrust laws. The jury could consider the following factors:

> First, the nature of the particular industry involved;
>
> Second, facts which are peculiar to the particular industry involved;
>
> Third, the nature of the restraint, and its effect, actual and probable;
>
> Fourth, the history of the restraint, and
>
> Fifth, the reasons for adopting the particular practice which is alleged to be a restraint.

An appellate court must assume that a jury properly followed the trial court's instructions. *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 167 (Tex.1982); *State v. Buckner Constr. Co.*, 704 S.W.2d 837, 846–47 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). Therefore, we presume that the jury (1) applied the "rule of reason" balancing test, (2) weighed the legitimate business reasons

for the defendants' dealings with UPS against their anticompetitive effects, and (3) decided that the defendants' conduct did not unreasonably restrain trade. If it did not unreasonably restrain trade, it follows that the defendants' conduct could not be "unnecessarily restrictive," or "exclusionary," under the balancing test that should have been employed to answer Questions No. 1 and 3.

■■■■ However, the Times Herald's sixth point of error asserts that the jury's negative answer to Question No. 5 is so clearly against the great weight and preponderance of the evidence as to be manifestly unjust. This point requires a consideration of all of the evidence, both in support of and contrary to the jury's finding. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986); *Gross v. Gross*, 808 S.W.2d 215, 220 (Tex.App.—Houston [14th Dist.] 1991, no writ). If the jury was presented with evidence sufficient that reasonable minds could differ, we may not substitute our opinion for that of the jury merely because we may have reached a different conclusion. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988). Further, the jury as trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

■■■■ Regarding the nature of the industry involved and facts peculiar to the newspaper industry, experts informed the jury that the Times Herald was in grave danger of falling into the dreaded "downward spiral" that can prove fatal to a newspaper, and that it would be tremendously difficult to start up a new newspaper in Dallas. Further, the News had been advised that if the Times Herald was removed as a competitor, the value of the News would dramatically increase.

Regarding the nature and history of the restraint, and its effect, actual and probable, experts noted that it is "unusual" and "extraordinary" for a large block of features to be transferred, and they could not identify a single situation in which a dominant newspaper had obtained exclusive, lo-

cal rights to all of a syndicate's features and rights to future creations. Prior to the agreement, the UPS vice president of sales, Robert Duffy, had warned its owners that the shift of features "would be perceived by the industry as a predatory move." More importantly, he noted, the agreement "would help close a newspaper" and UPS "would lose a competitive market." However, Duffy also described the joint venture as an "overwhelming business proposal," and he advised that transfering features to the News would benefit the creators by guaranteeing them revenue and placement in a "better newspaper" with higher circulation and an "open mind" to the needs of UPS.

The publisher of the Time Herald revealed that, as a result of the joint venture, the Times Herald became the only newspaper, among 1,642 in the United States, that is restrained from doing business with UPS. Despite the transfer, however, the Times Herald retained five of the top ten daily comic strips (according to a survey of the number of newspapers that publish each feature), eight of the top ten Sunday comics, and three of the top five humor columns; it also retained access to approximately 5,000 other features available to newspapers. Before the transfer, the Times Herald was regularly publishing only nine UPS features, so when the News began publishing all twenty-six of them, Dallas newspaper readers gained access to a greater number of features, published more frequently. Perhaps most damaging to the Times Herald's claim that it suffered from the transfer of features was its failure to name a single subscriber or advertiser lost to the News because of the transfer. The Times Herald's own circulation records showed that subscriptions were canceled for a number of other reasons, and there was evidence that its circulation had actually increased by the time of the trial.

Focusing on the reasons for adopting the particular practice which is alleged to be a restraint, the Times Herald contends that, in an attempt to do serious damage to their only competitor, the appellees forced UPS to terminate its contracts with the Times Herald. However, other witnesses testified that it was UPS that insisted that all of its features move to the News because a bulk transfer would prevent the Times Herald from retaliating by canceling any UPS creators left behind, as has happened at other newspapers, and it would make each of the creations eligible for television projects produced by the joint venture. The appellees identified the opportunity to venture into the field of television programming as a primary motive for contracting with UPS and agreeing to publish its features. The Times Herald, however, contends that the joint venture was but a sham to disguise the appellees' actual reason for raiding the UPS features. The Times Herald points out that the appellees made no investigation into whether the joint venture would be cost effective. Moreover, UPS did not even own broadcast rights to "Doonesbury" or "The Far Side," the two features in which the appellees had shown particular interest. However, the joint venture formed by Belo and UPS has proceeded in developing a package of animated commercials using other UPS features—"Dear Abby," "Cathy," and "Ziggy"—and it has signed an agreement with a Hollywood production company to develop a project featuring characters in the "Tank McNamara" comic strip.

We hold that, among the wealth of testimony, there was ample evidence which, if believed, would enable the jury to conclude that terms of the agreement between UPS and the appellees were justified and did not unreasonably restrain trade. Because the evidence was sufficient to support the jury's finding to Question No. 5, in which a balancing test was applied to all of the evidence, we conclude that the error in charging the jury on Questions No. 1 and 3 was harmless. *See Consol. Copperstate Lines, Inc. v. Standard Asbestos Mfg. & Insulating Co.*, 378 S.W.2d 704, 706 (Tex. Civ.App.—Fort Worth 1964, writ ref'd n.r.e.) (error in form of one special issue was harmless where in answering two other special issues, about which no complaint was made, the jury "returned what amounted to an identical finding"); *see also Walker v. Eason*, 643 S.W.2d 390, 391

(Tex.1982) (error in jury question was harmless and probably had no prejudicial effect when court charge was correct and jury made a definitive finding).

For the foregoing reasons, we overrule points of error one, two, three, four and six.

■■■■ In point of error number five, the Times Herald contends that the trial court erred in refusing to submit its claim for tortious interference with existing contracts. Elements of a cause of action for tortious interference with existing contracts include: (1) a contract subject to interference; (2) a willful and intentional act of interference; (3) proximate cause; and (4) actual damages or loss. *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 664 (Tex.1990). In reviewing the record for "some evidence" to support the submission of this issue, we consider the evidence most favorably in behalf of the complaining party, and if there is any conflicting evidence of probative value, so that reasonable minds might differ as to the ultimate conclusion to be reached, the question is for the jury to decide. *Kerrville HRH, Inc. v. City of Kerrville,* 803 S.W.2d 377, 383 (Tex.App.—San Antonio 1990, writ denied).

The appellees secretly negotiated with UPS for several months before signing the five-year contract and the syndicate agreement requiring the transfer of features to the News. It was not until after the agreements were signed that UPS notified the Times Herald that it was cancelling the longstanding contracts between UPS and the Times Herald and that the blanket cancellation was "non-negotiable." A News employee typed the cancellation letter in the offices of the News.

■■■■ Until terminated, a contract is valid, and third persons are not free to tortiously interfere with it. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex.1989). However, we find no evidence that either Belo or the News interfered with any of the Times Herald's "contractual rights." The syndicate agreement specifically states that UPS had no outstanding contractual obligations that would pre-

vent the publication of its features in the News. UPS gave the Times Herald proper notice of termination, whether 30 days' notice or, as in the case of "Doonesbury" and "Duffy," 90 days' notice. The Times Herald's interest in UPS features was that of a prospective contractual relation for which it had no assurance, only an expectancy, under contracts that were terminable at will. The Restatement [Second] of Torts § 768(i) (1979) provides the proper analysis of the Times Herald's "future hopes." In such a case, the plaintiff

> has no legal right but only an expectancy; and when the contract is terminated by the choice of the third person there is no breach of it.

The competitor, then, is free to cause the termination and obtain the future benefits for his own competitive advantage, for example, by offering better contract terms or a higher price. *Id.* Here, the appellees offered UPS both longterm contracts and more money, as well as an opportunity for television exposure for its creations. Because there is no evidence that the appellees interfered with a contractual right of the Times Herald, we overrule point of error number five.

■■■■ The question of whether the appellees illegally induced UPS to exercise its right to terminate its contractual relations was submitted to the jury in Questions No. 7 and 8. In Question No. 7, the jury was asked:

> Did the defendants knowingly and intentionally with the intent of harming the Dallas Times Herald cause Universal Press Syndicate not to continue its agreements or business relationship with the Dallas Times Herald?

Had the jury answered "yes," it was instructed in Question No. 8 that the appellees' conduct could be privileged or justified:

> A person is privileged or justified to interfere with the business relations of another with the motive and purpose, at least in part, to advance or protect his own business or financial interests. But one who interferes only out of spite, to

do injury to others, or for other bad motive, has no justification, and his interference is improper.

In point of error seven, the Times Herald contends that the trial court erred in denying its motion for new trial because the jury's negative answer to Question No. 7 was so clearly against the great weight and preponderance of the evidence as to be manifestly unjust. Again, there is competing evidence as to whether the appellees insisted on the exclusivity provision of the syndicate agreement or whether UPS required that the News publish all of its features for reasons listed above. The Times Herald contends that the bulk transfer was done with the intent to harm the Times Herald and that it "could have no other result." However, the appellees also demonstrated legitimate business motives for admiring the UPS features and wishing to enter into a joint venture that would utilize UPS creations. It was also contended that UPS required the bulk transfer of the features as a condition for going forward with the joint venture. Because there was ample evidence which, if believed, would enable the jury to conclude that the appellees did not contract with UPS with the unlawful intention of harming the Times Herald, we overrule point of error number seven.

 Finally, the Times Herald contends that the trial court erred in granting a directed verdict on its cause of action for civil conspiracy. A directed verdict can be upheld only if the record contains no evidence of probative force to raise any material fact questions. *E.g., Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 295 (Tex. 1983). On review, we must consider all of the evidence of civil conspiracy in the light most favorable to the Times Herald, discarding all contrary evidence and inferences and drawing all reasonable inferences in favor of the plaintiff's cause of action. *Id.; see also Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978). If we find any evidence of probative value that raises a material fact issue, then we must reverse the judgment and remand the cause for the jury's determination of that issue. Essential elements of a claim of civil conspiracy include:

(1) two or more persons;

(2) an object to be accomplished;

(3) a meeting of the minds on the object or course of action;

(4) one or more unlawful, overt acts; and

(5) damages as the proximate result.

*Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). The editor of the Times Herald identified UPS and the News as the alleged conspirators. He testified, "I felt like we were being kicked around by our competitor *and* the syndicate." (emphasis added.) The alleged object to be accomplished was the termination of the Times Herald's existing contracts with UPS and the transfer of UPS features to the News on an exclusive basis. The alleged "meeting of the minds" is depicted by the contract signed by UPS and the appellees following secret meetings. Regarding "one or more unlawful, overt acts," the Times Herald alleges that (1) the cancellation of the features was done tortiously and in violation of antitrust laws, and (2) the parties involved in establishing the joint venture violated industry standards that prohibit jointly owned television stations and newspapers from combining to create a competitive advantage for the newspaper's rival. Finally, there was some evidence that the Times Herald suffered as a result of the agreement.

 Proof of intent to participate in a conspiracy is a necessary factor of the "meeting of the minds" element. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968). The appellees respond that there was no evidence that they shared an intent with UPS "to inflict a wrong or an injury" on the Times Herald. *Traweek v. Larkin*, 708 S.W.2d 942, 946 (Tex.App.—Tyler 1986, writ ref'd n.r.e.). However, UPS stood to gain if circulation of the News increased, as payment terms of the syndicate agreement were tied to circulation figures of the News. This could be viewed as "some evidence" of an economic motivation to see the News cripple its competition. However, regarding the "object to be accomplished," the lawful cancellation of the

Times Herald's contracts with UPS was "accomplished" by lawful means: UPS merely exercised its contractual rights to terminate them upon proper notice. With no evidence of an agreement to commit an unlawful act to harm the Times Herald, the trial court correctly directed a verdict in favor of the appellees. We overrule point of error number eight.

The judgment of the trial court is affirmed.